COMMONWEALTH *vs.* DAWUD RAHIM.

Suffolk. December 1, 2003. - March 22, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Incest. Statute,* Construction.

This court concluded that a plain reading of the language of the statute crimi-
nalizing incest, G. L. c. 272, § 17, as well as the incest statute's legislative
history, establish that consanguinity is a necessary element of the crime of
incest, and that the incest statute makes criminal only relationships between
persons related by blood or adoption, not other relationships prohibited
under the marriage statute, G. L. c. 207, §§ 1 and 2 [274-284]; moreover,
nothing in the dictum contained in *Commonwealth* v. *Smith,* 431 Mass. 417
(2000), required a different result [284-286]. GREANEY, J., dissenting, with
whom MARSHALL, C.J., and SPINA, J., joined.

INDICTMENTS found and returned in the Superior Court Depart-
ment on December 17, 2001.

A motion to dismiss was heard by *Joseph M. Walker III,* J.,
and a question of law was reported by him to the Appeals Court.
The Supreme Judicial Court granted an application for direct
appellate review.

*Nancy L. Hathaway,* Assistant District Attorney, for the
Commonwealth.

*Robert J. Zanello* for the defendant.

CORDY, J. A grand jury indicted the defendant on numerous
charges, including rape and abuse of a child under the age of
sixteen years, in connection with the alleged sexual abuse of his
stepdaughter. Among those charges are six indictments charging
incest in violation of G. L. c. 272, § 17 (incest statute).[1] The
defendant moved to dismiss the incest charges, arguing that,

---

[1]The defendant was also indicted on charges of posing or exhibiting a child
in a state of sexual conduct, charges of wiretapping, and charges of rape and
abuse of a child under the age of sixteen years. None of these charges is
before us on this appeal.

because he was neither the natural nor adoptive father of his stepdaughter, and had no "blood-kin" relationship with her, the necessary element of consanguinity under the incest statute was absent. A Superior Court judge, pursuant to Mass. R. Crim. P. 34, 378 Mass. 905 (1979), reported the following question to the Appeals Court:

> "Are G. L. c. 272, § 17, and G. L. c. 207, § 1 [the marriage prohibition statute], to be read together for *all* purposes, and especially with regard to determining the 'degree of consanguinity' for determination of culpability with regard to the crime of incest? See *Commonwealth* v. *Smith*, 431 Mass. 417, 422 (2000)."

The proceedings were stayed. We allowed the Commonwealth's application for direct appellate review. We conclude that "consanguinity" is a necessary element of the crime of incest, and that the incest statute makes criminal only relationships between persons related by blood or adoption,[2] not other relationships prohibited by the marriage statute, G. L. c. 207, §§ 1 and 2.

1. *The plain language of § 17.* "[T]he primary source of insight into the intent of the Legislature is the language of the statute." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 853 (1983). "Where the language of a statute is plain, it must be interpreted in accordance with the usual and natural meaning of the words." *Gurley* v. *Commonwealth*, 363 Mass. 595, 598

---

[2]That "consanguinity" is a necessary element of the crime of incest is not inconsistent with the prosecution of incest between a parent and an adopted child. Although the issue is not presented in this case, we note that statutory language in the adoption statute, G. L. c. 210, § 6, specifically demonstrates the Legislature's intent that adoptive children be treated as consanguineous for the purpose of the criminal incest prohibition. The adoption statute states that an adoption decree shall provide that "except as regards succession to property, all rights, duties *and other legal consequences of the natural relation of child and parent* shall thereafter exist between the child and the [adoptive parent] and his kindred" (emphasis added). *Id.* Moreover, the adoption statue plainly anticipates that the criminal incest prohibition will apply to adoptive relationships when it states that "such decree shall not place the adopting parent or adopted child in any relation to any person, *except each other*, different from that before existing as regards marriage, or as regards rape, *incest* or *other sexual crime* committed by either or both" (emphasis added). *Id.*

(1973). Accord, e.g., *ROPT Ltd. Partnership* v. *Katin*, 431 Mass. 601, 603 (2000); *Weitzel* v. *Travelers Ins. Cos.*, 417 Mass. 149, 153 (1994); *Commonwealth* v. *One 1987 Mercury Cougar Auto.*, 413 Mass. 534, 537 (1992). In particular, absent clear indication to the contrary, statutory language is to be given its "ordinary lexical meaning." *Surrey* v. *Lumbermens Mut. Cas. Co.*, 384 Mass. 171, 176 (1981). *Randall's Case*, 331 Mass. 383, 385 (1954).

Section 17 criminalizes sexual intercourse between "[p]ersons within degrees of consanguinity within which marriages are prohibited or declared by law to be incestuous and void." The relationships in which marriages are prohibited or declared by law to be incestuous are listed in the marriage statute. Some of the prohibited relationships are relationships by blood,[3] while others are relationships by marriage.[4]

The meaning of the term "consanguinity" is uncontroverted: it is defined as a "relationship by blood." 2 C. Torcia, Wharton's Criminal Law § 242 (15th ed. 1994). See 3 Oxford English Dictionary 753 (2d ed. 1989) ("condition of being of the same blood; relationship by descent from a common ancestor; blood-relationship [Opposed to *affinity*, i.e., relationship by marriage]"); Black's Law Dictionary 299 (7th ed. 1999) ("relationship of persons of the same blood or origin"). The meaning of "consanguinity" is distinguished from "affinity:" consanguinity is a blood relationship, while affinity is a non-

---

[3]The prohibited blood relationships are: mother, grandmother, daughter, granddaughter, sister, brother's daughter (niece), sister's daughter (niece), father's sister (aunt), mother's sister (aunt), father, grandfather, son, grandson, brother, brother's son (nephew), sister's son (nephew), father's brother (uncle), and mother's brother (uncle). G. L. c. 207, §§ 1, 2.

[4]The prohibited relationships by marriage are: stepmother, grandfather's wife, grandson's wife, wife's mother (mother-in-law), wife's granddaughter, wife's daughter (stepdaughter), wife's granddaughter, stepfather, grandmother's husband, daughter's husband (son-in-law), granddaughter's husband, husband's grandfather, husband's son (stepson), and husband's grandson. G. L. c. 207, §§ 1, 2.

Notably, a relationship between mother-in-law and son-in-law is prohibited, but a relationship between father-in-law and daughter-in-law is permitted. The Legislature amended G. L. c. 207, § 1, to permit marriages between a father-in-law and a daughter-in-law. St. 1983, c. 277.

blood relationship acquired through marriage. See 3 Oxford English Dictionary, *supra.*[5]

There can be no doubt that the Legislature is and has been fully acquainted with the difference between relationships defined by consanguinity and those defined by affinity. The term "consanguinity" appears throughout the General Laws. In almost every context, the Legislature uses "consanguinity" in conjunction with "affinity," making it readily apparent that the Legislature views the terms as distinct and mutually exclusive. See G. L. c. 274, § 4 (providing defense to prosecution for accessory after fact for defendant who is "by consanguinity, affinity or adoption, the parent or grandparent, child or grandchild, brother or sister of the offender"); G. L. c. 19D, § 1 (defining assisted living residence as location that, among other things, provides assistance to "three or more adult residents who are not related by consanguinity or affinity to their care provider"); G. L. c. 40D, § 1 (*u*) (defining "[c]ontinuing [c]are [f]acility," for purpose of urban development, as "facility at which there is furnished to individuals, other than an individual related by consanguinity or affinity to the person furnishing such care [enumerated services]"); G. L. c. 55, § 18 (*h*) (15) (ii) (permitting candidate for public office to dispose of residual campaign funds by donation to charitable organization or scholarship fund, provided that neither candidate nor any official of candidate's political committee "be related by consanguinity or affinity to any trustee, officer, principal or beneficiary of said entity"); G. L. c. 93, § 76 (*a*) (defining "[c]ontinuing care" for purpose of determining whether entity is nursing home as

---

[5]Some dictionaries list a secondary definition of "consanguinity" that includes nonblood relationships. See, e.g., The American Heritage Dictionary 283 (1981) ("1. Blood relationship. 2. Any close connection or affinity"). However, as the Oxford English Dictionary makes clear, this secondary definition is used more commonly in reference to the figurative relationship between inanimate objects, rather than the relationship between people. See 3 Oxford English Dictionary 753-754 (2d ed. 1989) (defining consanguinity as "3. *fig.* Oneness of nature; relationship, affinity" and listing as examples [1] "The consanguinity of doctrine"; [2] "Such is the consanguinity of our intellects"; [3] "Between the painted window, the prayer-book on which its light falls, and the adjacent monument, there is consanguinity"). In reference to relationships between human beings, the plain meaning of "consanguinity" retains its primary definition — relationship by blood.

"furnishing to an individual, other than an individual related by consanguinity or affinity to the person furnishing such care, of [enumerated services]"); G. L. c. 268B, § 5 (*g*) (3) (permitting exception to rule that high-level public officials must disclose names of their creditors "if the creditor is a relative of the reporting person within the third degree of consanguinity or affinity").

In other contexts, the Legislature uses "consanguinity" without "affinity," but nonetheless includes language that specifically refers to relationships by marriage *separately.* See, e.g., G. L. c. 3, § 43 (requiring executive and legislative agents to submit statements of expenditures, "except that the executive or legislative agent shall not be required to report such expenditures . . . made for or on behalf of . . . a relative within the third degree of consanguinity of the executive or legislative agent or of his spouse or the spouse of any such relative . . . an executive or legislative agent shall not be prohibited from offering or giving to a public official or public employee who is a member of his immediate family or a relative within the third degree of consanguinity or of such agent's spouse or the spouse of any such relative any such gift or meal, beverage or other item to be consumed"); G. L. c. 268B, § 1 (*g*) (excluding from definition of "gift" in context of financial disclosures by public employees gifts received from "relative within the third degree of consanguinity of the reporting person or of the reporting person's spouse or from the spouse of any such relative").[6] In sum, in every other statute, the Legislature supplements its use of "consanguinity" with other language encompassing relationships by marriage, and plainly understands "consanguinity" as relationship by blood alone.

By its plain language, therefore, G. L. c. 272, § 17, selects for criminal punishment those relationships listed in the marriage statute, that are relationships of consanguinity (blood), leaving out by its silence relationships of affinity (marriage). It

[6]General Laws c. 109A, § 2, uses "consanguinity" in an identical manner, but its language was taken without modification from the Uniform Fraudulent Transfer Act and, therefore, is less probative on the *Massachusetts* Legislature's use of "consanguinity." 7A (Part II) U.L.A. 276 (Master ed. 1999).

is the limiting language of § 17 itself — "within degrees of consanguinity" — that defines and limits the set of G. L. c. 207 relationships to which § 17 applies.

To interpret § 17 to include both relationships by consanguinity and by affinity would give no meaning to the phrase "within degrees of consanguinity." See *Bolster* v. *Commissioner of Corps. & Taxation*, 319 Mass. 81, 84-85 (1946) ("None of the words of a statute is to be regarded as superfluous . . ."). Had the Legislature intended § 17 to criminalize marriage or sexual conduct within *all* of the relationships listed in §§ 1 and 2, it could easily have avoided the term "consanguinity" (i.e., "[p]ersons between whom marriages would be declared by law to be incestuous and void . . ."), or it could have used the phrase "consanguinity or affinity" that it has employed in other contexts. The Legislature's choice to include only "consanguinity" cannot be disregarded.

While a court must normally follow the plain language of a statute, it need not adhere strictly to the statutory words if to do so would lead to an absurd result or contravene the clear intent of the Legislature. See *Commissioner of Revenue* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999). Far from creating an "absurd" result, interpreting the Massachusetts incest statute in accord with the plain meaning of its words would place Massachusetts in the mainstream of the law nationally, and there is no basis from which to conclude that this would contravene the clear intent of the Legislature.

Of the forty-nine States other than Massachusetts, twenty do not punish any form of affinal incest.[7] Additionally, seven states punish affinal incest only if the victim is a child or if the sexual

---

[7]See Alaska Stat. § 11.41.450 (LexisNexis 2002); Ariz. Rev. Stat. Ann. § 13-3608 (West 2001); Ariz. Rev. Stat. Ann. § 25-101 (West 2000); Cal. Penal Code § 285 (West 1999); Cal. Fam. Code § 2200 (West 1994); Fla. Stat. ch. 826.04 (2003); Haw. Rev. Stat. § 572-1 (1993); Haw. Rev. Stat. § 707-741 (1993); Idaho Code § 18-6602 (Lexis 1997); Idaho Code § 32-205 (Michie 1996); Ind. Code Ann. § 35-46-1-3 (Lexis 1998); Kan. Stat. Ann. §§ 21-3602 21-3603 (1995); La. Rev. Stat. Ann. § 14:78 (West 1986); Me. Rev. Stat. Ann tit. 17-A, § 556 (West 1983); Minn. Stat. § 609.365 (2002); Nev. Rev. Stat. § 122.020 (2001); Nev. Rev. Stat. § 201.180 (2001); N.M. Stat. Ann. § 30-10-3 (Michie 2003); N.Y. Penal Law § 255.25 (McKinney 2000); N.D. Cent. Code § 12.1-20-11 (Michie 1997); N.D. Cent. Code § 14-03-03 (Michie 1997); 18 Pa. Cons. Stat. Ann. § 4302 (West 1983); repeal of

contact was nonconsensual.[8] Massachusetts is therefore not alone in providing no criminal punishment for consensual adult sexual contact within affinal relationships.[9] In addition, the Massachusetts statute would by no means be anomalous in barring more classes of relationships from civil marriage than it punishes under its criminal incest statute. It is common for other jurisdictions to have criminal incest provisions that are less restrictive than their counterpart civil marriage restrictions.[10]

---

R.I. Gen. Laws § 11-6-4, by 1989 R.I. Pub. Laws 214, § 1; Vt. Stat. Ann. tit. 15, §§ 1-3 (LexisNexis 2002); Vt. Stat. Ann. tit. 13, § 205 (Lexis 1998); Va. Code Ann. § 18.2-366 (Michie 1996); Va. Code Ann. § 20-38.1 (Lexis 2000); Wis. Stat. Ann. § 944.06 (LexisNexis 1996); Wis. Stat. Ann. § 765.03 (West 2001).

[8]See Iowa Code § 709.4 (2001) (prohibiting as "sexual abuse" sexual relationship with person related "by blood or affinity to the fourth degree" who is fourteen or fifteen years of age); Mich. Comp. Laws §§ 750.520b-750.520c (West 1991) (punishing as "sexual conduct" relationship with person "related by blood or affinity to the fourth degree" who is at least thirteen but less than sixteen years of age); Mont. Code. Ann. § 45-5-507 (2003) (permitting consent as defense to incest if victim is at least eighteen years of age); Neb. Rev. Stat. § 28-703 (1995) (including sexual penetration with "minor stepchild" within definition of incest); N.J. Stat. Ann. § 2C:14-2 (West Supp. 2003) (punishing as "aggravated sexual assault" relationship with person "related to the victim by blood or affinity to the third degree" who is at least thirteen but less than sixteen years of age and punishing as "sexual assault" relationship with person "related to the victim by blood or affinity to the third degree" who is at least sixteen but less than eighteen years of age); S.D. Codified Laws. Ann. § 22-22-19.1 (Michie 1998) (punishing as incest sexual contact "if the other person is under the age of twenty-one and is within the degree of consanguinity or affinity within which marriages are by the laws of this state declared void"); Wash. Rev. Code § 9A.64.020 (2002) (punishing as incest sexual contact with "descendant," and defining descendent to include "stepchildren and adopted children under eighteen years of age").

[9]The point of examining the law in other jurisdictions is not, of course, to uncover and adopt a majority rule. Rather, it is to assess whether interpreting the statute as written would place Massachusetts law so outside the mainstream as to suggest that the Legislature must have intended some other result.

[10]For example, see D.C. Code Ann. § 22-1901 (West 2001) (criminal incest law); D.C. Code Ann. § 46-401 (West 2001) (marriage prohibition); 1974 Mich. Pub. Acts 266, § 3 (repealing criminal incest law); Mich. Comp. Laws § 551.3 (1981) (marriage prohibition); 1989 R.I. Pub. Laws 214, § 1 (LexisNexis 2002) (repealing criminal incest law); R.I. Gen. Laws §§ 15-1-1 to 15-1-4 (LexisNexis 2003) (marriage prohibitions). See also Alaska Stat. § 11.41.450 (LexisNexis 2002); Alaska Stat. § 25.05.021 (LexisNexis 2002); Del. Code Ann. tit. 11, § 766 (2001); Del. Code Ann. tit. 13, § 101(a) (1999); 720 Ill.

In addition, the criminalization of affinity relationships as incestuous is explicitly rejected by the Model Penal Code.[11] The Code criminalizes marriage, cohabitation, or sexual intercourse with "an ancestor or descendant, a brother or sister of the whole or half blood [or an uncle, aunt, nephew or niece of the whole blood]," Model Penal Code and Commentaries § 230.2 (1980),[12] and it adds, "The relationships referred to herein include blood relationships without regard to legitimacy, and relationship of parent and child by adoption." *Id.* The commentaries to the Model Penal Code make clear that the drafters carefully considered and rejected affinity-based incest (with the exception of the adoptive parent-child relationship):

> "[T]he relationship between stepparent and stepchild may achieve a decidedly different character. Particularly when the natural parent remarries after the child has reached maturity, the stepparent may not be a parent in any real sense. In such cases, there may develop a sexual

---

Comp. Stat. 5/11-11(2) (West 2003); 750 Ill. Comp. Stat. 5/212 (West 2003); Ind. Code Ann. § 35-46-1-3 (Lexis 1998); Ind. Code Ann. § 31-11-1-2 (LexisNexis 2003); Iowa Code § 726.2 (2000); Iowa Code § 595.19 (2000); Kan. Stat. Ann. § 21-3602 (1995); Kan. Stat. Ann. § 23-102 (1995); Ky. Rev. Stat. Ann. § 530.020 (Lexis 1996); Ky. Rev. Stat. Ann. § 402.010 (Michie 1999); La. Rev. Stat. Ann. § 14:78 (West 1986); La. Civ. Code Ann. art. 90 (West 1999); Minn. Stat. § 609.365 (2002); Minn. Stat. § 517.03 (2002); Mo. Rev. Stat. § 568.020 (1986); Mo. Rev. Stat. § 451.020 (1986); Mont. Code Ann. § 45-5-507 (2003); Mont. Code Ann. § 40-1-401 (2003); N.H. Rev. Stat. Ann. § 639:2 (West 1996); N.H. Rev. Stat. Ann. §§ 457:1, 457:2 (1992); Or. Rev. Stat. § 163.525 (2001); Or. Rev. Stat. § 106.020 (West 2001); 18 Pa. Cons. Stat. Ann. § 4302 (West 1983); 23 Pa. Cons. Stat. Ann. § 1304(e) (West 2001); Wash. Rev. Code § 9A.64.020 (2002); Wash. Rev. Code § 26.04.020 (2002); W. Va. Code § 61-8-12 (Lexis 2000); W. Va. Code § 48-2-302 (Michie 2001); Wyo. Stat. Ann. § 6-4-402 (LexisNexis 2003); Wyo. Stat. Ann. § 20-2-101 (LexisNexis 2003).

[11]When we discussed the purpose of the incest statute and concluded in *Commonwealth* v. *Smith*, 431 Mass. 417, 422 (2000), that "protect[ing] children within the family from sexual impositions by their elders" and not "eugenics" was the most compelling purpose for the incest prohibition, we relied heavily on the detailed analysis provided by the commentaries to the Model Penal Code. Indeed, the very statement of purpose in the *Smith* case appears with a citation to the Model Penal Code. See *id.*, citing Model Penal Code and Commentaries § 230.2 comment 2(c)-(e), at 405-407 (1980).

[12]The drafters inserted some relationships in brackets to express doubt as to whether they should be included. See Model Penal Code and Commentaries § 230.2 comment 3(a), at 410.

relationship that is neither illicit nor exploitative, as, for example, where a grown man marries his stepmother, who may be his own age, after his father's death. . . . Because there are situations where persons related by affinity should be permitted to marry, it therefore follows that they should not be included within the incest prohibition."

*Id.* at § 230.2 comment 3(b), at 413-415.[13]

The Massachusetts Legislature could well have considered the same policy concerns as the drafters of the Model Penal Code did decades later and reached an identical conclusion, which is reflected in a plain reading of the statutory language.

2. *Legislative history.* "When the use of the ordinary meaning of a term yields a workable result, there is no need to resort to extrinsic aids such as legislative history." *Bronstein* v. *Prudential Ins. Co.*, 390 Mass. 701, 704 (1984). Accord *Leary* v. *Contributory Retirement Appeal Bd.*, 421 Mass. 344, 345-346 (1995); *State Bd. of Retirement* v. *Boston Retirement Bd.*, 391 Mass. 92, 94 (1984). Nonetheless, even assuming that there is room within the word "consanguinity" for an interpretation including relationships by affinity, the history of amendments to the incest prohibition suggests that the Legislature understood "consanguinity" as relationship by blood.

The Province Laws of 1695-1696 was the first codification of the incest prohibition in Colonial Massachusetts.[14] Specifically, St. 1695-1696, c. 2, § 1, enumerated a list of degrees, including both relationships by blood and relationship by marriage, within

---

[13]The decision to exclude relationships of affinity from the Model Penal Code was by no means unconsidered. Rather, as the dissent points out, the drafters openly acknowledged the "valid reasons for prohibiting sexual relationships between stepparent and stepchild." Model Penal Code and Commentaries, *supra* at § 230.2 comment 3(b), at 412. Nonetheless, after consideration of the reasons both for and against criminal prohibition, the drafters ultimately reasoned that including affinal relationships in the criminal prohibition "seems inappropriate . . . particularly when felony penalties are at stake." *Id.* at 414.

[14]The Colonial Laws in force before the enactment of the Province Laws of 1695-1696 contained only a brief notation regarding incest: "In answer to the Question; Whether it be lawful for a Man that hath buried his first Wife, to Marry with her that was his first Wives natural Sister? The Court resolves it on the Negative." The General Laws and Liberties of the Massachusetts Colony (1672 ed.) 102, reprinted in The Colonial Laws of Massachusetts (1890).

which marriage was prohibited,[15] and § 2 provided for punishment for men or women who marry or "carnally know each other, being within any of the degrees before recited in this act."[16] Unambiguously, § 2 reached *all* of the relationships listed in § 1, those of both consanguinity and affinity.

Shortly after independence, the General Court enacted "An Act for regulating marriage and divorce," St. 1785, c. 69. That act similarly set out a list of relationships (some by blood, others by marriage) for which marriage was prohibited, St. 1785, c. 69, § 1, and required that persons engaged in prohibited marriages must divorce. Once "divorced for the cause either of affinity or consanguinity," they were subject to criminal penalties if they lived together. *Id.* at § 6. This act marks the first appear-

---

[15]Specifically, St. 1695-1696, c. 2, § 1, stated:

"That no man shall marry any woman within the degrees hereinafter named in this act; that is to say, no man shall marry his grandfather's wife, wive's grandmother, father's sister, mother's sister, father's brother's wife, mother's brother's wife, wive's father's sister, wive's mother's sister, father's wife, wive's mother, daughter, wive's daughter, son's wife, sister, brother's wife, wive's sister, son's daughter, daughter's daughter, son's son's wife, daughter's son's wife, wive's son's daughter, wive's daughter's daughter, brother's daughter, sister's daughter, brother's son's wife, sister's son's wife, wive's brother's daughter, wive's sister's daughter . . . ."

[16]In full, St. 1695-1696, c. 2, § 2, read:

"That every man and woman who shall marry or carnally know each other, being within any of the degrees before recited in this act, and shall be convicted thereof before his majestie's justices of assize and general gaol delivery, such man and woman so convicted shall be set upon the gallows by the space of an hour, with a rope about their neck and the other end cast over the gallows, and in the way from thence to the common gaol shall be severely whipped, not exceeding forty stripes each; also every person so offending shall forever after wear a capital I of two inches long and proportionable bigness, cut out in cloth of a contrary colour to their cloaths, and sewed upon their upper garments on the outside of their arm or on their back in open view; and if any person or persons having been convicted and sentenced for such offence shall at any time be found without their letter so worn during their abode in this province, they shall by warrant from a justice of the peace be forthwith apprehended and ordered to be publickly whipp'd not exceeding fifteen stripes, and so from time to time *toties quoties.*"

ance of the term "consanguinity" in the incest statute, and, by pairing its use with "affinity," the General Court clearly recognized that there was a difference between them and understood that the list of prohibited relationships contained both types.

It was the next change to the incest statute that created what is essentially the modern criminal prohibition. The Revised Statutes of 1836 included a list of prohibited marriages in the chapter on marriage,[17] and, in R.S. (1836), c. 130, § 13, stated:

> "All persons, being within the degrees of consanguinity, within which marriages are prohibited, or declared by law to be incestuous and void, who shall intermarry with each other, or who shall commit adultery or fornication with each other, shall be punished by imprisonment in the state prison, not more than twenty years, or in the county jail, not more than three years."[18]

This section has undergone no relevant subsequent modification.

Why the Legislature inserted "consanguinity" and chose not to add "affinity" to R.S. (1836), c. 130, § 13, is not specifically documented in its legislative history. Nonetheless, by consulting "sources presumably known to the statute's enactors," including dictionary definitions from that time, *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977), we can be reasonably certain that it was not because of a misunderstanding about the distinctly different relationships they encompassed. Noah Webster's 1828 dictionary defines "consanguinity" in sharp contrast with affinity:

---

[17]Revised Statute (1836), c. 75, §§ 1, 2, listed the prohibited relationships.

[18]The dissent apparently reads this provision as applying "to 'persons' whose marriages otherwise are 'declared by law to be incestuous and void,' " whether or not those marriages are "within the degrees of consanguinity." *Post* at 288 (Greaney, J., dissenting). However, we think that the grammatical structure of the provision precludes such a reading. The phrase "declared by law to be incestuous and void" clearly modifies the noun "marriages." In turn, the word "marriages" is within the phrase "within which marriages are prohibited, or declared by law to be incestuous and void." By the structure of the statute, that phrase can only describe "degrees of consanguinity." Thus, the statute punishes adultery or fornication between persons within the degrees of consanguinity within which marriages are declared by law to be incestuous and void.

"The relation of persons by blood; the relation or connection of person descended from the same stock or common ancestor, in distinction from affinity or relation by marriage. It is lineal or collateral."

1 An American Dictionary of the English Language 46 (1st ed. 1828). Thus the only existing history concerning the insertion of "consanguinity" into the criminal prohibition on incest also supports limiting the prohibited relationships to relationships by blood.[19]

3. *Our dictum in* Commonwealth *v.* Smith. In *Commonwealth v. Smith*, 431 Mass. 417 (2000), we stated that the prohibitions of § 17 extend to "certain affinal kin as well as stepparents." This statement is clearly dictum, and we give it little weight. We have long held that we are not bound by "language which was unnecessary" in an earlier decision "and which passed upon an issue not really presented." *Old Colony Trust Co.* v. *Commissioner of Corps. & Taxation,* 346 Mass. 667, 676 (1964).

Chief Justice John Marshall explained the primary reason for the dicta-holding distinction in 1821:

"The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

*Cohens* v. *Virginia,* 19 U.S. (6 Wheat.) 264, 399-400 (1821). When a court decides an issue that has not been argued by any party, it makes its decision without the benefit of the vigorous advocacy on which the adversary process relies. See *Penson* v. *Ohio,* 488 U.S. 75, 84 (1988), quoting Kaufman, Does the Judge Have a Right to Qualified Counsel?, 61 A.B.A. J. 569, 569 (1975) ("The paramount importance of vigorous representation

---

[19]While the plain language and the legislative history of G. L. c. 272, § 17, unambiguously exclude relationships of affinity from the reach of the incest prohibition, "[i]f the statutory language '[could] plausibly be found to be ambiguous,' the rule of lenity requires the defendant be given 'the benefit of the ambiguity.' " *Commonwealth* v. *Carrion,* 431 Mass. 44, 45-46 (2000), quoting *Commonwealth* v. *Roucoulet,* 413 Mass. 647, 652 (1992). Stated otherwise, if the statute does not *unambiguously* criminalize affinity relationships, it must be construed in favor of the defendant.

follows from the nature of our adversarial system of justice. This system is premised on the well-tested principle that truth — as well as fairness — is 'best discovered by powerful statements on both sides of the question' "). The question whether § 17 extended to affinal relationships was not briefed or argued by either party in the *Smith* case; and neither party had an interest in the outcome of that question, because the defendant was accused of incest based on conduct with his biological daughter, *Commonwealth* v. *Smith, supra* at 417. Because the *Smith* court did not have the benefit of *any* advocacy concerning whether § 17 reached affinal relationships, its dictum on the subject was almost certainly incompletely investigated.[20]

In *Smith*, the defendant was charged with having sexual conduct, but not penile-vaginal sexual intercourse, with his daughter. *Commonwealth* v. *Smith, supra* at 418. The defendant argued that he could not be prosecuted under § 17 because, at the time, it criminalized only "sexual intercourse," not other sexual activities. *Id.* This argument was based in part on his contention that the incest prohibition was designed to prevent genetic abnormalities, and the prohibition did not therefore extend to types of sexual contact that could not lead to pregnancy. *Id.* at 421. In rejecting this argument, we stated, without analysis or explanation, that the prohibitions in § 17 extended to "affinal" relationships, thus indicating that the purpose of the incest prohibition is broader than simply eugenics. *Id.* at 421-422. Ultimately, however, we concluded that no matter what the purpose of the statute, its language did not extend to prohibit sexual activities other than penile-vaginal intercourse. *Id.* at 425. Plainly, the determination that the

---

[20]The dissent argues that the fact that the Legislature amended the incest statute in response to the *Smith* case to add unnatural sexual intercourse, see St. 2002, c. 13, without changing the language "persons within the degrees of consanguinity" suggests that "the Legislature accepted the definition stated in the *Smith* case." *Post* at 288 (Greaney, J., dissenting). "Ascertaining meaning from the Legislature's decision not to enact statutory language, however, is an uncertain endeavor. . . . The principal way the courts ascertain the intent of the Legislature is through the language the Legislature chooses." *Commonwealth* v. *Houston*, 430 Mass. 616, 630-631 (2000) (Cowin, J., concurring). Accord *Polaroid Corp.* v. *Commissioner of Revenue*, 393 Mass. 490, 496 (1984) ("Legislative inaction gives no instructive signal concerning the construction of a statute enacted by a prior Legislature, particularly one enacted decades earlier").

language of § 17 did not extend beyond penile-vaginal intercourse rendered the statement in *Smith* "language which was unnecessary" to the outcome of the case.[21]

In addition, *Smith* did not even address other language (also dicta) in previous decisions of this court and the Appeals Court suggesting that consanguinity — meaning a blood relationship — is a necessary element of incest. In *Commonwealth* v. *Templeman*, 376 Mass. 533 (1978), a case, like this one, involving allegations that the defendant had engaged in sexual intercourse with his stepdaughter, we noted that the "charge of incest was the subject of a nolle prosequi because the necessary element of consanguinity was absent." *Id.* at 538. Accord *Commonwealth* v. *Doe*, 8 Mass. App. Ct. 297, 298-299 n.2 (1979), quoting *Commonwealth* v. *Haywood*, 247 Mass. 16, 20 (1923) (noting "that courts in which the question has arisen generally construe statutes defining incest to require a blood relationship [and] it has been held that an 'essential element' of incest is 'consanguinity.' "

4. *Conclusion.* This is no doubt a difficult case in the sense that construing the statute in accord with the plain meaning of its words will result in the dismissal of six indictments alleging that the defendant committed incest by having sexual intercourse with his stepdaughter when she was fifteen and sixteen years old.[22] But the underlying conduct alleged is violative of a number of other criminal statutes under which the defendant is also charged. While the idea that this form of "incest" may not be criminal may be repugnant to many,[23] "the words of [a] statute cannot be stretched beyond their fair meaning in order to

---

[21]Without additional explanation, the dissent states that this language in *Smith* "is a critical part of the court's analysis." *Post* at 288 (Greaney, J., dissenting). As we have explained, the language is unnecessary to the court's holding. We do not, therefore, understand it to be "critical."

[22]It is this difficulty to which the dissent points when it notes the "startling result that the defendant cannot be prosecuted for having sexual intercourse with his stepdaughter." *Post* at 287 (Greaney, J., dissenting). Of course, the defendant in this case *is* being prosecuted under statutes in addition to the incest statute for having sexual intercourse with his stepdaughter. See note 1, *supra.*

[23]See Metteer, Some "Incest" is Harmless Incest: Determining the Fundamental Right to Marry of Adults Related by Affinity without Resorting to State Incest Statutes, 10 Kan. J.L. & Pub. Pol'y 262, 262 (2000) (noting

relieve against what may appear to be a hard case." *Grove Hall Sav. Bank* v. *Dedham*, 284 Mass. 92, 96 (1933). The interpretation that the Commonwealth urges on us sweeps up and criminalizes not only the repugnant conduct alleged in this case, but a wide assortment of relationships between consenting adults.[24] The reported question is answered as explicated above. We leave it to the Legislature to expand the incest prohibition if it so chooses.

GREANEY, J. (dissenting, with whom Marshall, C.J., and Spina, J., join). The court reasons that the term "consanguinity," G. L. c. 272, § 17 (incest statute), cannot be read together with G. L. c. 207, §§ 1 and 2 (marriage prohibition statutes), with the startling result that the defendant cannot be prosecuted for having sexual intercourse with his stepdaughter. Despite the self-definition in the incest statute by means of express reference to, and incorporation of, the marriage prohibition statutes, the court strives to examine a plethora of sources to support its conclusion. The court's analysis is faulty, both in law and policy, for the reasons now described that persuade me that the defendant's sexual intercourse with his stepdaughter can be prosecuted as incest.

1. It is self-evident, as mentioned above, that the incest statute creates the definition of the crime within its own terms by expressly referring to, and incorporating, the marriage prohibition statutes. This alone should end the inquiry. But any doubt on the matter is settled by the following.

(a) In *Commonwealth* v. *Smith*, 431 Mass. 417 (2000), we concluded that the words "sexual intercourse" in the incest statute were limited to penile-vaginal penetration but did not cover unnatural sexual intercourse. In construing the statute, we stated that " '[p]ersons within the degrees of consanguinity' to whom the [incest] statute's prohibitions of intermarriage and sexual intercourse apply are not limited to blood relations, but

---

that sentiment that some incest can be harmless is "sure to cause a visceral reaction in many if not most readers").

[24]Several States only prohibit incest involving persons under a certain age. See note 8, *supra*.

include also certain affinal kin as well as stepparents." *Id.* at
422. We carefully explained why this is, and should be, so:

> "The Legislature's purpose in criminalizing incestuous
> conduct must thus extend beyond the prevention of genetic
> defects, as this goal would clearly not be advanced by
> criminalizing marriage itself, without more, between blood
> relations, and still less by prohibiting coitus between affi-
> nal kin who do not share a common bloodline. See Model
> Penal Code and Commentaries § 230.2 comment 2(b), at
> 403; comment 3(b), at 412-413 (1980). Indeed, the scope
> of the incest statute, as it relates to both conduct and
> persons, strongly suggests that its framers valued and
> sought to promote the sanctity and integrity of familial
> relationships, as well as to protect children within the fam-
> ily from sexual impositions by their elders. See, e.g., *id.* at
> § 230.2, comment 2(c)-(e), at 405-407, and authorities
> cited; *Commonwealth* v. *Fouse*, 417 Pa. Super. 534, 538
> (1992)."

*Id.*

Two years after the *Smith* decision, the Legislature rewrote the
incest statute to broaden the sexual conduct prohibited to include
unnatural sexual intercourse. See St. 2002, c. 13. The amendment
was in direct response to the *Smith* decision. No change was
made in the definition of incest contained in the statute. It is obvi-
ous from this that the Legislature accepted the definition stated in
the *Smith* case, and expressed agreement with the language therein
explaining the purpose of the statute. Far from being dicta, the
quoted language is a critical part of the court's analysis and is to
be accepted for its substantive content.

(b)(i) The court refers to the legislative history of the incest
statute in an effort to support its conclusion. *Ante* at 281-284.
But, ultimately, the court concedes, as it must, that there is
nothing there because the Legislature's reason for not inserting
the word "affinity" in R.S. (1836), c. 130, § 13, is unknown.
*Ante* at 283-284. It can be said, from the language of that statute,
that doing so was unnecessary in light of the statute's language,
applying to "persons, being within the degrees of consanguin-
ity, within which marriages are prohibited," and to "persons"
whose marriages otherwise are "declared by law to be incestu-
ous and void." R.S. (1836), c. 130, § 13. Further, the court

completely ignores the historical character of the statute, see *Commonwealth* v. *Ashey*, 248 Mass. 259, 260 (1924), which ultimately enforced "the Levitical decrees," that applied the prohibition against incest to relationships of affinity. See 2 C. Torcia, Wharton's Criminal Law § 242 (15th ed. 1994) (explaining that doctrine of affinity grew out of canonical maxim that husband and wife are one); Metteer, Some "Incest" is Harmless Incest: Determining the Fundamental Right to Marry of Adults Related by Affinity Without Resorting to State Incest Statutes, 10 Kan. J.L. & Pub. Pol'y 262, 273 (2000) (explaining that incest prohibition under law of Leviticus extended to relationships by affinity).

(ii) The court also cites to various statutes to argue that the Legislature views the terms "consanguinity" and "affinity" as distinct. *Ante* at 276-277. Thus, the court reasons that, by employing the term "consanguinity" in the incest statute, the Legislature intended to limit the statute's reach to relationships of consanguinity only. *Ante* at 277-278. The use of the terms "consanguinity" and "affinity" in other statutes does not resolve the present issue concerning the interplay of the specific statutes with which we are concerned. If the Legislature had intended to limit the incest statute's reach only to relationships of consanguinity, it could have done so by leaving out any reference to the marriage prohibition statutes, instead of choosing, as it did, to supplement the incest statute by expressly incorporating the marriage prohibition statutes into that statute's reach.

(iii) The court's references to the laws of other States shed no light on the answer to the reported question. The main point, of course, is what our statute actually does, but it is worth noting that Massachusetts is by no means alone in punishing affinal incest because of the crime's destructive impact on the familial relationship. Twenty-eight States punish affinal sexual intercourse or sexual conduct of some kind.[1]

(c) The court places great emphasis on the Model Penal Code,

---

[1] These State statutes are: Ala. Code § 13A-13-3 (1994); Ark. Code Ann. § 5-26-202 (LexisNexis 2003); Colo. Rev. Stat. § 18-6-301 (LexisNexis2003); Conn. Gen. Stat. § 53a-191 and § 46b-21 (2003); Del. Code Ann. tit. 11, § 766 (2001); Ga. Code Ann. § 16-6-22 (2003); 720 Ill. Comp. Stat. § 5/11-11 (West 2003); Iowa Code § 709.4 (2000); Ky. Rev. Stat. Ann. § 530.020 (Lexis 1999); Md. Code Ann., Fam. Law § 2-202 (1999) and Crim. Law § 3-

which does not make affinal incest criminal. We have not adopted the Model Penal Code, although from time to time, we express agreement with principles expressed therein. That is precisely what was done in the *Smith* case, where the Code was cited as persuasive in stating that "sexual relations between stepparent and stepchild may have the same disorganizing impact on the family unit and the same destructive effect on the growth of the child's personality as would incest between natural parent and child." Model Penal Code and Commentaries § 230.2 comment 3(b), at 412-413 (1980). Indeed, as the Code candidly recognizes, "[t]here are valid reasons for prohibiting sexual relationships between stepparent and stepchild." *Id.* at 412.

2. The court's authority for its conclusions does not withstand rigorous examination, and it is wrong to use that authority to declare an act of the Legislature futile and meaningless in significant part. In the last analysis, the text of the incest statute, combined with the *Smith* decision, leaves no room to doubt the statute's purpose and application.[2] The court leaves us with a situation where this defendant will avoid prosecution for incest, and (unless the statute is changed) a stepfather can have consensual sexual intercourse with his sixteen year old stepdaughter without fear of criminal sanction. (But, he will not be able to marry her.) As a result of the court's decision, we are left with an unfortunate state of affairs that frustrates legislative intent and undermines the value and stability of the family as the core unit of society. I dissent.

---

323 (LexisNexis 2002); Mich. Comp. Laws Ann. § 750.520b (2003); Miss. Code Ann. § 97-29-5 (Lexis 2000) and § 93-1-1 (LexisNexis 2003); Mo. Rev. Stat. § 568.020 (1986); Mont. Code Ann. § 45-5-507 (2003); Neb. Rev. Stat. § 28-703 (1995); N.H. Rev. Stat. Ann. § 639:2 (West 1996 & Supp. 2003); N.J. Stat. Ann. § 2C:14-2 (West Supp. 2003); N.C. Gen. Stat. § 14-178 (2003); Ohio Rev. Code Ann. § 2907.03 (Baldwin 1997 & Supp. 2003); Okla. Stat. tit. 21, § 885, and tit. 43, § 2 (2001); Or. Rev. Stat. §§ 163.505, 163.525 (2001); S.C. Code Ann. § 16-15-20 (West 1985); S.D. Codified Laws § 22-22-19.1 (Michie 1998); Tenn. Code Ann. § 39-15-302 (LexisNexis 2003); Tex. Penal Code § 25.02 (West 2003); Utah Code Ann. § 76-7-102 (Lexis 1982); Wash. Rev. Code § 9A.64.020 (2002); W. Va. Code § 61-8-12 (Lexis 2000); Wyo. Stat. Ann. § 6-4-402 (LexisNexis 2003).

[2]For this reason, the rule of lenity cited by the court has no application. See *Commonwealth* v. *Welosky*, 276 Mass. 398, 401-402 (1931), cert. denied, 284 U.S. 684 (1932).