SUPERIOR COURT 
 
 CHRISTIAN CAPANO vs. MICHAELA DUNNE, as she is CHAIRPERSON OF THE FIREARM LICENSING REVIEW BOARD (and a consolidated case[1])

 
 Docket:
 1984CV00460-C
 
 
 Dates:
 January 26, 2021
 
 
 Present:
 Robert B. Gordon Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR JUDGMENT ON THE PLEADINGS
 
 

 The plaintiffs in these consolidated cases, Christian Capano (“Capano”) and Ian Sisson (“Sisson”) (together, the “Plaintiffs”), appeal from decisions by the defendant, Firearm Licensing Review Board (the “Board”), denying the restoration of the Plaintiffs’ respective licenses to carry a firearm. Now before the Court are cross-motions for judgment on the pleadings filed by Capano, Sisson, and the Board pursuant to Superior Court Standing Order 1-96, G.L. c. 30A, § 14, and Mass. R. Civ. P. 12(c). For the reasons which follow, the Plaintiffs’ motions shall be ALLOWED and the Board’s motions shall be DENIED.
BACKGROUND
I. Underlying Legal Framework
In Massachusetts, operating under the influence of alcohol (“OUI”) is a misdemeanor punishable by up to two and one-half years imprisonment. G.L. c. 90, § 24. Based on the offense’s maximum term of imprisonment, state law prohibits individuals who have been

---------------------------

[1] Ian Sisson vs. Michaela Dunne, as she is Chairperson of the Firearms Licensing Review Board, Suffolk Superior Court, Civil Action No.1984CV00461-A.

-1-

convicted of OUI from obtaining a license to carry a firearm (“LTC”). See G.L. c. 140, § 131(d)(i)(B) (prohibiting individuals convicted of misdemeanors “punishable by imprisonment for more than 2 years” from obtaining an LTC). The prescribed maximum term of imprisonment likewise prohibits individuals convicted of OUI from carrying firearms under federal law, see 18 U.S.C. § 922(g)(1) (“It shall be unlawful for any person—who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess . . . any firearm or ammunition.”), unless the OUI conviction “has been expunged, or set aside” or is one for which the person convicted “has been pardoned or has had civil rights restored . . . unless such . . . restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.” 18 U.S.C. § 921(a)(20) (“Section 921(a)(20)”).
Under state law, LTC applicants disqualified on account of a conviction for OUI can petition the Board to review their eligibility to carry firearms “after the passage of 5 years from conviction, . . . release from confinement, commitment, probation, or parole supervision for such conviction . . . whichever is last occurring ” G.L. c. 140, § 130B(b). If, by a two-thirds vote, the Board finds that the OUI conviction is the petitioner’s “sole disqualifier”[2] for an LTC and, “by clear and convincing evidence, that the petitioner is a suitable person to be a firearm identification card or license to carry holder,” the Board “shall determine that the petitioner’s right or ability to possess a firearm is fully restored in the commonwealth with respect to such conviction . . . and that such conviction shall not prohibit such petitioner from applying to a licensing authority for a firearm identification card or license to carry.” G.L. c. 140, § 130B(d).
General Laws chapter 140, § 131(d) provides that a “determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or

---------------------------

[2] General Laws chapter 140, § 131 identifies a number of other circumstances that disqualify an applicant from obtaining an LTC, including, inter alia, commitment to a mental institution, being younger than age twenty- one at the time of application, being a fugitive from justice, and renouncing United States citizenship.

-2-

engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or (ii) existing factors that suggest that, if issued a license, the applicant or licensee may create a risk to public safety.” The Supreme Judicial Court has stated that an applicant may also be “unsuitable” to possess an LTC if the applicant is disqualified based on any of the disqualifying circumstances or criteria expressly identified in G.L. c. 140, § 131. See, e.g., Commonwealth v. Adams, 482 Mass. 514, 533 & n.11 (2019) (a person is no longer “suitable to possess a license” upon the occurrence of a disqualifying event); Chief of Police of City of Worcester v. Holden, 470 Mass. 845, 859 (2015) (noting that the “suitability standard works in tandem with the disqualifying provisions of the statute”); Firearms Records Bureau v. Simkin, 466 Mass. 168, 180 (2013) (licensing authority may deem license holder unsuitable “for reasons falling outside the enumerated disqualifiers”).[3]
II. The Plaintiffs’ Petitions
The Plaintiffs are Massachusetts residents with previous convictions for OUI. [4] In 2017, the Plaintiffs submitted separate petitions to the Board seeking review of their eligibility for an LTC. Over the course of several days in 2017 and 2018, each Plaintiff appeared before the Board and presented evidence in support of his petition. In January, 2019, the Board issued written findings of fact and decisions denying the Plaintiffs’ petitions.
In its findings of fact, the Board opined that each Plaintiff had taken responsibility for his offense, rarely drank alcohol at present, was responsible in his use of firearms, and had presented credible testimony that “suggested a favorable determination of suitability.” The Board

---------------------------

[3] In view of the foregoing case law, the Court rejects the Plaintiffs’ argument that the Board’s determination of a petitioner’s suitability to possess an LTC is strictly limited to an assessment of the nexus between a petitioner’s conduct and a risk to public safety.

[4] Capano was convicted of OUI in Malden District Court on September 26, 1997. Sisson was convicted of OUI in Orange District Court on October 2, 2008.

-3-

nonetheless concluded that it could do nothing to change the fact that the Plaintiffs would remain prohibited from carrying firearms under federal law, which, in turn, rendered them unsuitable to possess firearms under Massachusetts law.[5] The Board’s conclusion in this regard rested on an opinion issued by the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (the “ATF”). Based on its interpretation of Logan v. United States, 552 U.S. 23 (2007), the ATF determined that restoring an individual’s right to possess a firearm under state law does not restore the civil rights contemplated by the “civil rights restored” provision of Section 921(a)(20), the provision of the statute quoted ante that exempts certain convictions from federal firearms disqualification.
After receiving the Board’s decisions, the Plaintiffs timely filed the instant appeals. Before this Court, the Plaintiffs argue that the Board’s decisions should be reversed pursuant to the Massachusetts Administrative Procedure Act, G.L. c. 30A, because they are based upon an error of law.
DISCUSSION
I. Standard of Review
General Laws c. 30A, § 14 grants a right of judicial review to “any person or appointing authority aggrieved by a final decision of any agency in an adjudicatory proceeding[.]” Paragraph seven of Section 14 permits the Court to “affirm the decision of the agency, or remand the matter for further proceedings before the agency; or . . . set aside or modify the decision . . . if it determines that the substantial rights of any party may have been prejudiced because the

---------------------------

[5] General Laws c. 140, § 131(e) prohibits licensing authorities from issuing an LTC “unless the colonel [of the State Police] has certified, in writing, that the information available to him does not indicate that the possession of a firearm . . . by the applicant would be in violation of state or federal law.” See also G.L. c. 140, § 131(q) (“Nothing in this section shall authorize the purchase, possession or transfer of any weapon, ammunition or feeding device that is, or in such manner that is, prohibited by state or federal law.”).

-4-

agency decision is” unconstitutional, exceeds the agency’s authority, based on an error of law, unsupported by substantial evidence, or arbitrary and capricious. See G.L. c. 30A, § 14(7).
As the parties appealing the administrative decision, the Plaintiffs bear the burden of demonstrating the decision’s invalidity. Merisme v. Board of Appeals on Motor Vehicle Liability Policies and Bonds, 27 Mass. App. Ct. 470, 474 (1989). The Court is required to “give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as the discretionary authority conferred on it” by statute. G.L. c. 30A, § 14(7). The Court may not substitute its own judgment for that of the agency, nor may the Court disturb the agency’s findings of fact. Guarino v. Director of Div. of Employment Sec., 393 Mass. 89, 92
(1984). The Court’s sole function “is to determine whether the [agency] applied correct legal principles in reaching its decision.” Id.
II. Analysis
The Plaintiffs’ appeals turn on a single issue: does the restoration of an individual’s right to possess a firearm under state law constitute a restoration of civil rights within the meaning of 18 U.S.C. § 921(a)(20)?[6] For the reasons which follow, the Court agrees with the Plaintiffs that it does.
The parties’ arguments rely principally on their respective interpretations of certain language in Logan v. United States, which held that the “civil rights restored” exemption set forth in Section 921(a)(20) does not encompass “state-court convictions that at no time deprived the offender of civil rights[.]” 552 U.S. at 26. Before undertaking its analysis of this issue, the Supreme Court briefly recited the history of Section 921(a)(20), acknowledging that while the statute “does not define the term ‘civil rights,’ courts have held, and [the] petitioner agree[d], that

---------------------------

[6] To the extent it does, the exemption from statutory disqualification is triggered, and federal law would no longer defeat the Plaintiffs’ LTC rights in Massachusetts.

-5-

the civil rights relevant under [the statute] are the rights to vote, hold office, and serve on a jury.” Id. at 27-28. The Board, echoing the position since adopted by the ATF, argues that the foregoing language affirmatively restricts the rights triggering the “civil rights restored” provision of Section 921(a)(20) to the enumerated rights to vote, hold office, and serve on a jury. The Plaintiffs counter that the language in question constitutes “passive” dicta and, as such, does not represent the decisional restriction advanced by the Board. The Plaintiffs contend that, in addition to the three rights recited in Logan, a state’s restoration of an individual’s right to keep and bear arms constitutes the restoration of a “civil right” within the purview of Section 921(a)(20). The Plaintiffs have the better argument.
As set forth ante, Logan considered whether the “civil rights restored” exemption applied to state court convictions that did not result in the loss of any rights. The petitioner, who had only been convicted of state law misdemeanors, did not dispute that his convictions had not triggered the loss of any rights, and expressly conceded that the relevant civil rights under Section 921(a)(20) were the rights to vote, hold office, and serve on a jury. Logan, 552 U.S. at 28. Because the petitioner did not dispute that his post-conviction civil rights had remained unaltered, the Supreme Court had no reason to consider (much less define) which civil rights Section 921(a)(20) encompasses. Accordingly, the disputed language referencing the rights to vote, hold office, and serve on a jury was no more than background information setting up Logan’s analysis of whether civil rights can be “restored” if they were never taken away in the first place. The language in fact played no part in the decision’s holding, and must therefore be considered dicta. See Commonwealth v. Rahim, 441 Mass. 273, 284 (2004) (quoting Old Colony Trust Co. v. Commissioner of Corps. & Taxation, 346 Mass. 667, 676 (1964)) (dicta is non-

-6-

binding language that passes “upon an issue not really presented”). For this reason, to determine

whether the civil rights restored provision of Section 921(a)(20) encompasses any additional rights, the Court must examine the underlying circuit court precedent purporting to confine the relevant rights to the three recited in Logan.
In United States v. Indelicato, the First Circuit explained that “the plurality view among the circuits” is that when Congress enacted Section 921(a)(20), “it had in mind the core cluster of ‘citizen’ rights that are typically lost by felons and restored by pardons, namely, the right to vote, to serve on a jury and to hold public office.” 97 F.3d 627, 630 (1st Cir. 1996) (abrogated on other grounds by Logan, 552 U.S. at 30). Many of the decisions comprising this plurality view can be traced back to United States v. Cassidy, 899 F.2d 543 (6th Cir. 1990), which reviewed the language and legislative history of Section 921(a)(20) in order to determine which rights must be restored for a conviction to fall within the statute’s reach.[7] In light of the language in Section 921(a)(20) immediately following the civil rights restored provision — stating that the restoration of rights lost upon a conviction removes federal firearms prohibitions triggered by that conviction “unless such . . . restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms” — Cassidy concluded that
“[i]t was the unmistakable intent of Congress to eliminate the disabling effect of a . . . conviction when the state of conviction has made certain determinations, embodied in state law, regarding a [convicted person’s] civil rights and firearms privileges. . . . [and] it is clear that Congress intended that courts refer to state  law to determine whether an individual should be subject to federal firearms disabilities by virtue of a criminal conviction. If state law has restored civil rights to a [convicted person] without expressly limiting [their] firearms privileges, that [person] is not subject to federal firearms disabilities. This is the clear and unambiguous intent of Congress as expressed in section 921(a)(20).”

---------------------------

[7] For example, Indelicato cited United States v. Caron, 77 F.3d 1, 2 (1st Cir. 1996), in support of its assertion identifying the relevant civil rights as the rights to vote, hold office, and serve on a jury. Indelicato, 97 F.3d at 629. Caron, in turn, cited Cassidy in support of the same proposition. Caron, 77 F.3d at 2. See also McGrath v. United States, 60 F.3d 1005, 1007 (2d Cir. 1995) (citing Cassidy in support of assertion that the civil rights referenced in Section 921(a)(20) are the rights to vote, hold public office, and serve on a jury); United States v. Meeks, 938 F.2d 131, 133 (9th Cir. 1991) (same).

-7-

899 F.2d at 546.
Cassidy buttressed its interpretation of Section 921(a)(20) by examining the history of the 
statute, finding that it was part of legislation enacted “in response to perceived deficiencies in existing law concerning firearms and enforcement abuses by the [ATF].” Id. By exempting certain convictions from federal firearms prohibitions, such as those for which an individual has had his civil rights restored, Congress sought to direct the ATF’s enforcement efforts “away from . . . unintentional and technical violations of the Gun Control Act toward . . . more ‘serious, intentional criminals[,]’” see id. (quoting S. Rep. 97-476, 97th Cong., 2d Sess. 14-17 (1982)),
and “give effect to state reforms with respect to the status of an ex-convict.” Id. at 548. Based on  the statute’s evident intent, Cassidy held that a person has had his civil rights restored within the meaning of Section 921(a)(20) where the law of the state of conviction permits him “to exercise the privileges of shipping, transporting, possessing, or receiving a firearm” and the rights accorded to him “by virtue of his citizenship” in that state, which “include the right to vote, the right to seek and hold public office and the right to serve on a jury,” have been restored to him. Id. at 549. Cassidy, therefore, did not hold or even suggest that the rights to vote, hold office, and serve on a jury were the only rights contemplated by Congress in Section 921(a)(20), but simply identified these rights as among those that lie within the power of the states (rather than the federal government) to take away and restore as the result of a conviction.[8] See Richardson v. Ramirez, 418 U.S. 24, 56 (1974) (holding that the Fourteenth Amendment permits states to prohibit people convicted of felonies from voting); Carter v. Jury Comm’n, 396 U.S. 320, 332 (1970) (“It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. . . . and confine [jury] selection to those possessing . . .

---------------------------

[8] During oral argument on January 19, 2021, the parties were unable to identify any civil rights that are lost and restorable following a conviction other than the rights identified in Cassidy and the right to bear arms, discussed infra.

-8-

sound judgment, and fair character.”); Medina v. Osawatomie, 992 F. Supp. 1269, 1277 (D. Kan. 1998) (observing that the holding of Richardson may be extended to preclude convicted persons from holding public office). By thus tying the “civil rights restored” provision of Section 921(a)(20) to the rights that states have the power to restrict, Congress articulated a presumption that the restoration of such rights “express[es] ‘a state’s judgment that a particular person or class of persons is, despite a prior conviction, sufficiently trustworthy to possess firearms.’” Indelicato, 97 F.3d at 630 (quoting McGrath v. United States, 60 F.3d 1005, 1009 (2d Cir. 1995)).
Almost twenty years after Cassidy was decided, and just one year after Logan, the Supreme Court held for the first time that the Second Amendment “conferred an individual right to keep and bear arms.” District of Columbia v. Heller, 554 U.S. 570, 595 (2008). Two years 
later, the Supreme Court held that the individual right to bear arms extended to the states through the Fourteenth Amendment. See McDonald v. Chicago, 561 U.S. 742, 750 (2010). After Heller and McDonald, therefore, government authorization to bear arms was no longer a privilege, but a constitutional right. Compare United States v. Nazzaro, 778 F. Supp. 1, 2 (D. Mass. 1991) (issued prior to Heller and McDonald and opining that “[t]here is no constitutional right to possess firearms except in connection with the organization of a militia”); Cassidy, 899 F.2d at 549 n.12 (issued prior to Heller and McDonald and noting that there was “no individual right to possess a firearm”). The Supreme Court has since referred to the Second Amendment right to bear arms as a “civil right” (forfeitable upon criminal conviction) that is tantamount to the right to vote, in effect recognizing this right as coextensive in legal import with at least one of the three civil rights expressly identified in Cassidy and Logan. See National Federation of Independent Business v. Sebelius, 567 U.S. 519, 573 (2012) (noting that an individual who

-9-

disobeys a law passed under Congress’s Commerce Clause power may be subject to sanctions accompanied by the “attendant consequences of being branded a criminal,” which include “deprivation of otherwise protected civil rights, such as the right to bear arms or vote in elections”).
Turning, then, to whether the right to bear arms constitutes a civil right within the intention of Section 921(a)(20), the Court reiterates that nothing in either the language of the statute or the cases interpreting it suggests that the rights to vote, serve on a jury, and hold public office were meant to comprise an exhaustive and inelastic list. To the contrary, so limiting the relevant civil rights to the exclusion of all others lost upon conviction, particularly the right to possess a firearm, is plainly inconsistent with Congress’s intent to defer to the states’ evidence- based judgment regarding an individual’s suitability to possess firearms.
In the case at bar, the Board determined that the Plaintiffs are, in fact, sufficiently trustworthy to carry firearms; and it indicated that it was prepared to restore their rights to do so but for the ATF’s disabling interpretation of Section 921(a)(20). To concede such constraint in the realm of firearms right restoration is a matter of no small irony, given that Congress designed  Section 921(a)(20) to defer to the states’ judgment on this very issue. In the present case, however, it is the Board that has effectively deferred to a federal agency’s cramped construction of its authority. Such a somersault of logic turns the clear intent of Congress on its head, and frustrates the very purpose that animates Section 921(a)(20). It is the considered judgment of the Court, therefore, that the right to bear arms is a civil right within the ambit of Section 921(a)(20); and a decision by the Board pursuant to G.L. c. 140, § 130B that a convicted person who lost 

-10-

such a right is now suitable to be an LTC holder constitutes a restoration of that person’s civil rights under this statute.[9]
Accordingly, the Board’s conclusion that issuing a favorable suitability decision to the Plaintiffs would not alter the fact that they were prohibited from possessing a firearm under federal law constituted an error of law under G.L. c. 30A, § 14(7). The Board’s decisions finding each Plaintiff unsuitable to possess an LTC, therefore, shall be vacated, and their cases remanded to the Board for further proceedings consistent with this opinion.[10]
CONCLUSION AND ORDER
For the foregoing reasons, Capano’s and Sisson’s Motions for Judgment on the Pleadings are ALLOWED. The Board’s Motions for Judgment on the Pleadings are DENIED.
SO ORDERED.

@Robert B. Gordon Justice of the Superior Court

---------------------------

[9] At least nineteen Massachusetts District Courts and two courts outside of Massachusetts have considered this issue and reached a similar conclusion. See DuPont v. Nashua Police Dept., 113 A.3d 239, 247 (N.H. 2015) (it is “unlikely that Congress intended to credit the restoration of ‘core rights’ as indicative of trustworthiness, but exclude the restoration of the very right at issue—the right to possess firearms—from the trustworthiness calculus.”); Johnson v. Department of State Police, 2020 WL 124213 at *7 (Ill. 2020) (“A state regulatory scheme that restores a person’s eligibility for firearm rights by affirmatively and expressly evaluating that persons’ future dangerousness—through evidence, and not generalization—is entirely consistent with the trustworthiness rationale that underpins the ‘civil rights restored’ provision.”). Accord Fitzpatrick v. McEnaney, Civil No. 18-000235, slip op. at 2 (Dist. Ct. Dept., Ayer Div., February 4, 2019) (successfully petitioning the Board restores an individual’s right to possess a firearm under state and federal law); Vining v. McIntyre, Civil No. 19-00794, slip op. at 2 (Dist. Ct. Dept., Woburn Div., Feb. 6, 2019) (“[T]he restorative power of the [Board] reinstates an individual’s right to possess a firearm pursuant to both state and federal law.”); Chmyzinski v. Police Chief, Town of Sunderland, Civil No. 18-00188, slip op. at 2 (Dist. Ct. Dept., Greenfield Div., Jan. 9, 2018) (favorable Board decision “fully restored [petitioner’s] civil right to possess a firearm [and] as a result the Petitioner is not disqualified by Federal Law from possessing a firearm.”).

[10] Inasmuch as the Court has found in favor of the Plaintiffs, there is no need to address their motions to strike the attachments to the Board’s oppositions.

-11-

@January 26, 2021

-12-

xxz