ADOPTION OF DON & others.[1]

Barnstable. April 3, 2001. - September 26, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Minor,* Care and protection, Custody, Adoption. *Adoption,* Dispensing with parent's consent. *Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Evidence,* Child custody proceeding. *Due Process of Law,* Child custody proceeding. *Practice, Civil,* Findings by judge. *Constitutional Law,* Confrontation of witnesses.

In a proceeding to dispense with parental consent to adoption, the judge's findings were supported by the record and, taken together, constituted clear and convincing evidence requiring the allowance of petitions brought by the Department of Social Services under G. L. c. 210, § 3, to dispense with the parents' consent to the adoption of their children. [164-167]

Parents, in a proceeding involving custody and termination of their parental rights, had no right under art. 12 of the Declaration of Rights of the Massachusetts Constitution to face-to-face confrontation with two of their children, when those children testified against them at trial. [167-169]

A delay of nearly five years from the time children were removed from their parents by the Department of Social Services until proceedings to dispense with the parents' consent to adoption concluded, while regrettable, did not violate the parents' due process rights, where the parents did not show that the outcome of the proceeding would have been different had the proceeding occurred more expeditiously. [169-170]

This court declined to disturb orders of the single justice of the Appeals Court denying respective motions by parents for a stay of proceedings to dispense with parental consent to the adoption of their children absent the presentation of "meritorious issues" in the usual sense of that phrase in appellate practice. [170]

PETITIONS filed in the Barnstable Division of the Juvenile Court Department on December 15, 1994.

The cases were heard by *Carol Gibson Smith,* J.

Motions to stay decrees dispensing with parental consent to adoption were heard in the Appeals Court by *George Jacobs,* J., and *Mel L. Greenberg,* J.

---

[1]His four siblings, whom we shall call Kelly, Michael, Cliff, and Andrew. All names are pseudonyms.

The Supreme Judicial Court granted an application for direct appellate review.

*Sherrie Krasner* for the father.

*Thomas R. Stritter* for the mother.

*Virginia A. Peel*, Special Assistant Attorney General (*Lisa Thompson Cioffi* with her) for the Department of Social Services.

*Warren M. Yanoff* for the children.

CORDY, J. The mother and the father appeal from orders and decrees of the Barnstable Division of the Juvenile Court Department adjudicating their five biological children in need of care and protection pursuant to G. L. c. 119, § 26; ordering the commitment of the children to the permanent custody of the Department of Social Services (department); and dispensing with the need for parental consent to adoption pursuant to G. L. c. 210, § 3, as well as the denial by a single justice of the Appeals Court of the parents' separate motions to stay the decrees dispensing with their consent to the adoption of their minor children pending resolution of this appeal.

The parents contend that the trial judge erred in relying on "stale" evidence in concluding that the department had proved by clear and convincing evidence that they were unfit to have custody of their children, when more current evidence demonstrated their fitness. They also argue that, because of the fundamental liberty interests at stake for them, they had a right under art. 12 of the Declaration of Rights of the Massachusetts Constitution to face-to-face confrontation with two of their children, when those children testified against them at trial. In the alternative, they argue that their due process rights were violated when the judge, with no evidentiary basis, set up special seating arrangements for the two child witnesses so that the parents could watch them testify only in profile, and from the rear of a small courtroom. Finally, they assert that their due process rights were violated by the extreme length of the proceedings against them, which did not conclude until nearly five years after the removal of the children by the department. We granted the parents' joint application for direct appellate review and now affirm the orders and decrees of the Juvenile Court, as well as the single justice's denial of a stay.

1. *Facts.* We draw our facts from the judge's findings, which are not disputed by either parent, reserving certain details for discussion in conjunction with the issues raised.

The mother was emotionally and physically abused by her own parents, who were alcoholics. The father grew up without a father, and began drinking and using drugs in his teens. The mother was aware of the father's substance abuse problems while they were dating, but she continued a relationship with him and they had their first child, Don, out of wedlock in 1986. The father continued to use drugs after Don was born. Nevertheless, mother and father were married in 1987, shortly before the birth of their second child, Kelly. Michael was born in 1989, and Cliff in 1991. During this period, the father had several "relapses" into substance abuse. He attended rehabilitation programs on a sporadic basis in 1989, before dropping out entirely. The mother showed a willingness to accept her husband's behavior and explanations for not following through on rehabilitation, explanations that the judge did not find credible.

By the time the mother became pregnant with a fifth child, Andrew, her relationship with the father was under great stress, due in part to what she characterized as a house "full of children." In August, 1992, the mother applied for voluntary services from the department because she was "overwhelmed." A social worker set up services for the family, noting that in addition to alcohol, the father was actively using crack cocaine.

On September 4, 1992, a G. L. c. 119, § 51A, report was filed and supported for neglect of the children by both parents due to domestic violence, substance abuse and the mother's need for psychiatric treatment. On September 30, 1992, another § 51A report was filed and supported for neglect of the children by both parents. That same month, the police were called to the family home by the mother, who claimed she had been abused by the father. She secured a protective order.[2]

---

[2]In her signed affidavit in support of the protective order, the mother stated:

"[The father] has pulled my hair and had cornered me . . . . In the past [the father] had thrown me across the room bruising my back. My oldest [child] witnessed it. [The father] has hit me in the nose has once

In November, 1992, while the father was enrolled in a substance abuse program, the mother called the department and requested voluntary placement of her four children out of her home, as she could not cope with their physical or emotional needs.[3] In December, 1992, Don and Kelly came home on weekends to stay with their mother. On December 18, 1992, a § 51A report was supported for the physical abuse of Kelly by her mother.

Andrew was born in March, 1993, while the other children remained in voluntary placement. The department provided a parent aide to the family to assist with parenting tasks and skill development. The plan was for the children to return to their parents in June, 1993, but the mother asked for more time to prepare the transition for the children's return home. As a result, it was not until the end of November, 1993, that all of the children were back in the home.

In March and November, 1994, § 51A reports were supported for the physical abuse of Don by his father, including one incident in which the father bit the son's nose. In March, 1994, a § 51A report was supported for the physical abuse of Cliff. In December, 1994, a § 51A report was supported for the medical neglect of Kelly. On December 15, 1994, the department filed an emergency care and protection petition pursuant to G. L. c. 119, § 24, alleging the abuse and neglect of the five

tried to strangle me. The verbal abuse is ongoing. The abuse at one point happened when I was pregnant. I am also pregnant now [with Andrew]. [The father] is a drug addict and alcoholic and scares me more when [he] drinks because his ang[er] increases. There are times when he is drinking and will have the kids with him. Because he has done these things I am asking the court to protect me."

In her testimony at trial, however, the mother denied that the father ever struck her, or that she was ever in fear of him. She denied saying that in 1992 she felt a lack of safety for herself or her children. The judge did not find this testimony credible, and noted that the mother was now adamantly denying any form of domestic abuse even though she had disclosed the father's abusive conduct to many different people.

[3]When the mother requested voluntary placement for her children, she stated that she was afraid of the effects of the father's substance abuse on Kelly and Don. At trial, however, she denied that this abuse had had any effect on her children, and also failed to acknowledge any detrimental effect on the children resulting from her decision to place them in the custody of the department.

children. The department was granted emergency custody by a judge in the Barnstable Juvenile Court. Following a seventy-two hour hearing, on December 23, 1994, the judge ordered that the children be placed at home, with the department retaining legal custody, on the condition that the parents follow a service plan.

Another § 51A report was filed on April 3, 1995, with the result that the department took custody of Kelly, Michael, and Cliff.[4] They were placed in foster care on April 13, 1995. After the three children were removed, the father had another relapse. The mother reported to the department that he would stay out all night drinking. During this period, she told a social worker that the father was "out of control." She once again told the father that, if the substance abuse continued, he could not come home. She failed, however, to follow through with her announced intention.

Don and Andrew were removed from the home on June 23, 1995, and placed in the temporary custody of the department.[5] In that same month, and again in October, 1995, the father was charged with various criminal offenses. He received suspended sentences. He then violated the conditions of his probation and received committed sentences.

From October, 1995, until the adjudication in this case on June 9, 1999, the mother continued to have supervised visits with the children. The judge found that most of the visits "went well." However, the mother had difficulty controlling all the children together. Various visits were described by observers as "noisy" and "chaotic." The mother was often in violation of visitation rules, failing to provide appropriate activities for all the children, having difficulty disciplining the children and attending to the needs of Andrew, and in a number of cases relying inappropriately on the presence of a relative. The social worker did not seek unsupervised visits between the mother and the children because she did not see any change in the mother's

---

[4]Kelly was removed for issues surrounding enuresis and depression. Cliff sustained an injury when he fell from his father's arms and hit his head. Michael had recently become very aggressive at school.

[5]The parents have not had any children in the home since June, 1995.

behavior and no acknowledgment concerning the abusive behavior in the home.

The department prepared service plans for the parents from 1992 until the time of trial. The father's plan tasks required that he attend Alcoholics Anonymous and Narcotics Anonymous, enter counselling, join a parenting group, enroll in an anger management group, participate in a domestic violence program, and refrain from using harmful discipline on the children. He failed to comply with these tasks.[6]

The mother's service plans required that she seek out counselling for treatment of depression, engage in domestic abuse education, develop a safety plan to follow when the father became abusive, attend an alcoholism awareness program, and attend parenting classes. She failed to pursue domestic abuse education because she continued to deny there was any domestic abuse in her household. She could not identify anything she had learned by attending a parenting class. She developed no safety plan. She failed properly to treat her depression. The mother did attend a family learning class from November, 1995, until January, 1997, but her participation began to wane after September, 1996. She would not sign an extended service plan in September, 1997. She did not participate in the updated court investigation on January 26, 1998, and at the time of trial, she was not in compliance with her most recent service plan.

2. *Proceedings.* Prior to February, 1997, the department's goal for the family was reunification. The department changed its goal to adoption for the four youngest children because the parents had not made sufficient progress for reunification. On April 24, 1997, after hearing, the judge granted the department's motion to amend the pleadings to add a request, pursuant to G. L. c. 210, § 3, that the judge dispense with the need for parental consent to the adoption of the four youngest children.

The trial on the merits took place over forty-five non-consecutive days between April 28, 1997, and December 11,

---

[6]A department social worker made a number of attempts to contact the father and send him a service plan after his incarceration. The father failed to communicate with the department, and did not participate in an updated court investigator's report in January, 1998.

1998.[7] On June 9, 1999, the trial judge issued 388 findings of fact and twenty-eight conclusions of law, determining that the parents were currently unfit to parent all five children, and that said unfitness was likely to continue into the indefinite future to a near certitude. The judge committed all five children to the permanent custody of the department and issued decrees terminating the parents' rights to consent to adoption of the youngest four. G. L. c. 119, §§ 24, 26. G. L. c. 210, § 3.

The parents filed timely notices of appeal. The parents also filed separate motions for a stay pending appeal from the orders dispensing with parental consent to adoption. The motions were denied. On September 21, and October 28, 1999, a single justice of the Appeals Court denied the parents' respective motions for a stay. The parents' appeals from the denial of the motions for a stay were consolidated with the instant appeal from the underlying adjudication.

On October 19, 1999, the department filed with the trial court a notice of intent to dispense with the parents' right to consent to Don's adoption.[8] The judge held a hearing on the matter on June 21, 2000. By stipulation, the parties rested on the evidence presented and the factual findings entered in the first trial. The parents did not present any additional evidence at the hearing. On August 24, 2000, the judge determined that the parents were currently unfit to parent Don and that it was in his best interest that their rights to consent to his adoption be terminated. The parents filed timely notices of appeal.

3. *Evidence of current unfitness of parents.* In order to grant a petition to dispense with parental consent to adoption pursuant to G. L. c. 210, § 3, due process requires that the judge must find by clear and convincing evidence, *Santosky v. Kramer*, 455 U.S. 745, 748 (1982), based on subsidiary findings proved by at least a fair preponderance of evidence, *Care & Protection of Laura*, 414 Mass. 788, 793 (1993), that a parent is currently

---

[7]In the procedural history accompanying her findings of fact, the judge lists only sixteen of these trial dates. Her findings, however, encompass the entire trial record.

[8]In 1996, Don told a court investigator that he wanted to disassociate himself from his father, and that his mother could not protect him. In January, 1997, Don began to express a desire to be adopted. He chose not to participate in visitations with his mother after December, 1997.

unfit to provide for the welfare and best interests of the child. *Adoption of Mary*, 414 Mass. 705, 711 (1993). We do not disturb the judge's findings absent a showing that they are clearly erroneous. *Care & Protection of Martha*, 407 Mass. 319, 327 (1990), and cases cited.

The judge's findings — which, as noted above, are unchallenged by either parent — are both specific and detailed, demonstrating, as we require, that close attention was given to the evidence. *Adoption of Helen*, 429 Mass. 856, 859 (1999), citing *Adoption of Hugo*, 428 Mass. 219, 224 (1998), cert. denied sub nom. *Hugo P. v. George P.*, 526 U.S. 1034 (1999); *Custody of a Minor (No. 1)*, 377 Mass. 876, 886 (1979). The mother nevertheless claims that the testimony of certain witnesses summarized in the judge's findings demonstrated that the mother had "done her utmost to comply with the many tasks imposed on her by [the department], and had progressed remarkably far in her personal development," and thus it was error for the judge to declare her a currently unfit parent. We do not agree.[9]

The judge properly focused on the current fitness of the parents. *Adoption of Quentin*, 424 Mass. 882, 886 (1997), citing *Adoption of Carla*, 416 Mass. 510, 517 (1993). *Adoption of Kimberly*, 414 Mass. 526, 528-529 (1993). She appropriately took into account each "parent's character, temperament, conduct, and capacity to provide for the [children] in the same context with [each] child's particular needs, affections, and age," *Adoption of Mary*, 414 Mass. 705, 711 (1993), and had an adequate evidentiary basis to find that, even in the period from the removal of the children in 1995 to the time of trial,[10] the mother had failed to build a support system, as she claimed;

---

[9]The mother, attempting to draw an analogy to the case of *Custody of Eleanor*, 414 Mass. 795, 800 (1993) (finding of parental unfitness, based entirely on one allegation of inappropriate touching later withdrawn, reversed), claims in her brief that the "principal allegation" against her "was that she would not accept her daughter's accusation of sexual abuse by mother's male companion." However, the judge in the present case stated in her findings that she would have determined it was in Kelly's best interest to be free from her parents even in the absence of Kelly's testimony about several instances of sexual abuse by the father.

[10]The father, in his brief, properly notes that, although "past patterns of parental neglect may have prognostic value, it is preferable that parental unfit-

was not consistently attending support groups or seeking to schedule employment; did not acknowledge any damage to the children resulting from the substance abuse in the home, or by choosing to place the children in foster care for a lengthy period of time; and on the whole had failed to demonstrate that she had achieved emotional or financial independence. See *Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 289 (1987) (evidence parents refused to maintain service plans and counselling programs designed to strengthen family unit relevant to determination of unfitness); *Adoption of George*, 27 Mass. App. Ct. 265, 268 (1989) ("The mother protests that the evidence of her unfitness is stale and that her life has stabilized. . . . To be sure, stale information cannot be the basis for a finding of current parental unfitness. . . . Prior history, however, has prognostic value. . . . Her history shows failures to follow through with therapy and other forms of assistance for her children and for herself." [Citations omitted]).

"We do not sit as a trial court to review de novo the evidence presented by the parties." *Adoption of Paula*, 420 Mass. 716, 730 (1995). Many of the parents' arguments amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses.[11] *Adoption of Quentin*, 424 Mass. 882, 886 n.3 (1997). "It is within the judge's discretion to evaluate the credibility of witnesses and to

---

ness be determined using the most recent information possible." See *Adoption of Diane*, 400 Mass. 196, 204 (1987). We have long held, however, that evidence of such ongoing patterns of parental neglect or misconduct, especially "*where unrebutted by more recent proof of parental capacity*, [can] provide[] a satisfactory basis for a finding of current parental unfitness" (emphasis added). *Custody of a Minor (No. 1)*, 377 Mass. 876, 883 (1979). See *Custody of Two Minors*, 396 Mass. 610, 621 (1986).

[11]The judge found that many of the witnesses relied on by the mother, and by the father, were not sufficiently familiar with the family's problems to provide testimony helpful or relevant to the issues in this case. For example, the father argues in his brief that the judge erred in "ignoring current probative expert evidence that [f]ather had no pathological propensity for violent or abusive behavior." The judge did not ignore this evidence, but found that it was based on primarily self-administered tests that relied on accurate reporting by the father. Because the father only selectively disclosed information to the psychologist administering the test, the judge found that conclusions based on this self-reporting had no meaningful significance.

make his findings of fact accordingly. . . . He was not obliged to believe the mother's testimony or that of any other witness." *Care & Protection of Three Minors*, 392 Mass. 704, 711 (1984). The judge's findings were supported by the record and, taken together, constituted the clear and convincing evidence required for the grant of the petitions brought by the department under G. L. c. 210, § 3, to dispense with the parents' consent to adoption of the children.

4. *Right to confrontation.* Don and Kelly both testified against their parents at trial.[12] In response to requests by the attorneys for the children and the department to "minimize the trauma" to the children while testifying, the judge configured the court room to allow the child witnesses to testify in the presence of their parents, but not in a manner that forced the child witnesses into a face-to-face confrontation with them. The accommodation in the small court room used for the trial was a minimal one. Don and Kelly testified in the same courtroom as other witnesses. Counsel were no more than four or five feet from the judge's bench, and counsel and the judge could pass items back and forth between them. The children sat in the same chair as other witnesses, at one end of the counsel table.[13] Counsel questioning the children sat at the other end of the counsel table, which was actually several tables placed together, the purpose being to force the child witnesses to keep their voices audible to all parties. During the children's testimony, the parents were instructed to sit in the back row of the court room

---

[12]Don was eleven years old when he began testifying on January 28, 1998. He stated that his parents yelled and swore at each other a lot. His father hit him approximately five times a week. His mother would hit him "once in awhile." He recalled his mother's trying unsuccessfully to control the other children by yelling at them in an attempt to stop their boisterous or wild behavior. Don also witnessed domestic abuse between his mother and his father, and saw his father pulling his mother's hair, yelling, and using profane language. Don once told a school nurse about being hit in his home.

Kelly was ten years old when she testified on September 23, 1998. She recalled a lot of hitting by her parents when she lived with them, mainly directed at Don and herself. Kelly recalled one incident of fighting when she saw her father pull her mother's hair and almost push her down the stairs.

[13]The judge explained at trial that "it's the Court's desire to keep the [child] witnesses as any other witnesses; testifying in the same chair where everyone else has testified, with no objection from counsel during this case . . . because this is the way this particular court room is set up."

(i.e., the furthest back of the three benches in the court room). The judge allowed the parents to pick any point on the bench to sit for a clear view of the child witnesses but asked that they refrain from moving during the children's testimony.[14]

The parents assert that these seating arrangements denied them their right under art. 12 to confront the child witnesses face-to-face.[15] Their argument relies, however, on our application of art. 12 in criminal cases. See *Commonwealth* v. *Amirault*, 424 Mass. 618, 628 (1997); *Commonwealth* v. *Johnson,* 417 Mass. 498, 503 (1994). We have never applied the art. 12 right of confrontation in a civil case. See *Frizado* v. *Frizado,* 420 Mass. 592, 596-597 n.3 (1995) ("Because a G. L. c. 209A proceeding is a civil, and not a criminal, proceeding, the constitutional right to confront witnesses and to cross-examine them set forth in art. 12 of the Declaration of Rights has no application in this case"); *Opinion of the Justices,* 406 Mass. 1201, 1218 n.15 (1989), citing *Commonwealth* v. *McGruder,* 348 Mass. 712, 716 (1965), cert. denied, 383 U.S. 972 (1966) ("art. 12 right of confrontation not applicable to civil proceedings"); *Commonwealth* v. *Daye,* 393 Mass. 55, 57 n.2 (1984) ("in civil cases no constitutional issues concerning the right of confrontation are presented").

"Custody proceedings are not criminal in nature . . . ." *Custody of Two Minors,* 396 Mass. 610, 616 (1986). "As parens patriae, the State does not act to punish misbehaving parents but to protect children," *id.,* and the dependent child's needs are paramount. This is not to derogate the natural right that parents have to the custody of their children, a right that is fundamental and constitutionally protected. *Little* v. *Streater,* 452 U.S. 1, 13 (1981). *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 587 (1981). Accordingly,

---

[14]On the first day of Don's testimony, when the attorney for the mother pointed out that the parents had been allowed to sit in the front row up to that point without objection from anyone, the judge explained: "Well, for the record, this is a small courtroom. And that would put . . . parents close to the young man. And I . . . want to give him a chance to be heard, without feeling overpowered by any of us, including parents. And I'll do everything possible to make it as fair as possible."

[15]Article 12 of the Declaration of Rights of the Massachusetts Constitution reads, in pertinent part: "[E]very subject shall have a right . . . to meet the witnesses against him face to face."

we have required that parents in child custody proceedings be represented by counsel and that the Commonwealth prove by clear and convincing evidence that parents are unfit to care and provide for their children before parental rights can be terminated. *Custody of a Minor (No. 2)*, 392 Mass. 719, 725 (1984) (clear and convincing standard of proof applicable in custody cases); *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 6 (1979) (indigent parent has constitutional right to court-appointed counsel in contested proceedings to terminate parental rights).

We have, however, repeatedly rejected incorporating the full panoply of constitutional rights afforded criminal defendants into proceedings involving custody and termination of parental rights. See, e.g., *Custody of Two Minors*, 396 Mass. 610, 617 (1986) ("privilege against self-incrimination applicable in criminal proceedings, which prevents the drawing of a negative inference from a defendant's failure to testify, is not applicable in a child custody case"); *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. 707, 711 (1981) (exclusionary rule does not apply to termination proceedings); *Custody of a Minor*, 375 Mass. 733, 746 (1978) (double jeopardy principles do not apply). We are not persuaded that the unique characteristics of a termination of parental rights proceeding require incorporating the art. 12 right of face-to-face confrontation guaranteed to defendants in criminal cases, and decline the invitation to do so here.[16]

5. *Delay*. The parents argue that the length of the proceedings

---

[16]The parents argue, in the alternative, that the special seating arrangements for Don and Kelly violated the parents' due process rights. We conclude that, since the art. 12 right to confrontation does not apply to this type of proceeding, the judge's instructions to the parents to sit anywhere they wished in the back row of a small courtroom while the children testified, and to refrain from moving during their testimony, do not raise due process concerns. The judge was within her discretion in her commendable effort to make the proceedings "as fair as possible" to all parties concerned. See note 14, *supra*.

In a proceeding that can result in the termination of all parental rights, due process requires that "a parent have the opportunity effectively to rebut adverse allegations concerning child-rearing capabilities." *Adoption of Mary*, 414 Mass. 705, 710 (1993). *Adoption of Edmund*, 50 Mass. App. Ct. 526, 529 (2000). Due process was satisfied here because the parents had the opportunity, through counsel, to cross-examine the child witnesses vigorously, in addition to presenting witnesses and other evidence on their own behalf.

resulted in a denial of their due process rights. In support of this assertion, they rely on *Care & Protection of Martha,* 407 Mass. 319, 330 (1990), where we stated that "an extraordinary and prejudicial delay in custody proceedings, not attributable to the parents, in some circumstances could rise to the level of a violation of due process." While the protracted nature of the proceedings in this case was regrettable, see *Care & Protection of Three Minors,* 392 Mass. 704, 705 n.3 (1984), the parents have failed to demonstrate that the delay was prejudicial to them such that it raises due process concerns.[17] While the substantial time lapse between the date of removal and the final adjudication, regardless of the many reasons therefor, was inordinate, the parents have not shown that the outcome of this case would have been different had the proceedings occurred more expeditiously. The harm of that delay in this case, as in many others, is unfortunately suffered principally by the children.

6. *Motions for a stay.* Finally, we do not disturb the orders of the single justice of the Appeals Court denying the parents' respective motions for a stay in this case,[18] as the parents had not presented "meritorious issues in the usual sense of that phrase in appellate practice." *Adoption of Duval,* 46 Mass. App. Ct. 916, 917 (1999), quoting *Jones* v. *Manns,* 33 Mass. App. Ct. 485, 492-493 & n.9 (1992).

7. *Conclusion.* The adjudications that the children were in need of care and protection are affirmed. The decrees terminating parental rights to consent to adoption are affirmed. The orders of the single justice denying motions for a stay are affirmed.

*So ordered.*

---

[17]Throughout the trial, the judge showed a consistent concern with the need to expedite these proceedings. There were various factors, beyond the continuances granted by the court (none of which is challenged by the parents) that contributed to the extended nature of the trial. These were delays caused by the illness of counsel, the failure of the correctional facility to deliver the father to court, the scheduling of counsel and the court, and by the mother as well.

[18]"Absent the allowance of a stay, a court may act on the basis of a decree dispensing with consent to adoption." *Adoption of Duval,* 46 Mass. App. Ct. 916, 917 (1999).