NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

24-P-712                                          Appeals Court

ADOPTION OF DORETTA (and two companion cases[1]).


No. 24-P-712.

Hampden.      September 15, 2025. – January 30, 2026.

Present:  Shin, Grant, & Hershfang, JJ.


Adoption, Care and protection.  Minor, Adoption, Care and
     protection.  Parent and Child, Adoption, Care and
     protection of minor.  Due Process of Law, Care and
     protection of minor, Assistance of counsel.  Constitutional
     Law, Assistance of counsel.  Department of Children &
     Families.  Practice, Civil, Adoption, Care and protection
     proceeding, Assistance of counsel, Self-representation.



     Petition filed in the Hampden County Division of the
Juvenile Court Department on September 7, 2021.

     Following review by this court, 101 Mass. App. Ct. 584
(2022), the case was heard by Carol A. Shaw, J.; a motion to

---

[1] Adoption of Daniel and Adoption of Erik.  The children's
names are pseudonyms.  We use the same pseudonyms for the
children that we used in an earlier appeal in this case.  See
Care & Protection of Doretta, 101 Mass. App. Ct. 584 (2022).  By
order of a single justice, Erik's appeal of the order denying
his amended and renewed motion to reopen the evidence was
consolidated with this appeal.  As he has not addressed the
order in his brief, the appeal of that order is deemed waived.
See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass.
1628 (2019).

reopen the evidence, filed on July 11, 2024, also was considered by her.

Joan M. Altamore for the mother.
Kylah Clay for Erik.
Margaret M. Geary for the father.
Kristin S. Braithwaite for Department of Children and Families.
Warren M. Yanoff for Doretta.
Lisa M. Kling for Daniel.

HERSHFANG, J.  The father, the mother, and one of the children, Erik, appeal from decrees issued by a judge of the Juvenile Court finding the father and the mother unfit to parent their three children and terminating their parental rights after a trial.  The appeals focus primarily on the judge's denial of the father's requests to represent himself and the mother's requests for new counsel, as well as the sufficiency of the evidence.  We affirm.

1.  Background.  The facts underlying the care and protection petition are detailed in an earlier appeal, Care & Protection of Doretta, 101 Mass. App. Ct. 584 (2022) (Doretta I).  We summarize here the judge's relevant posttrial findings of fact and conclusions of law, reserving some facts for discussion.

a.  The children.  The father and the mother are parents to three children:  Doretta, age thirteen at the time of trial, and twins Daniel and Erik, twelve years old at the time of trial.

The Department of Children and Families (department) filed a care and protection petition on behalf of the children in September 2021. Initially, the court granted conditional custody to the parents, but when the parents failed to comply with the conditions of custody, the department sought and was granted temporary custody. The children remained in the department's temporary custody throughout the case and, following the trial, were placed in the department's permanent custody.

All three children faced mental health and learning challenges. Doretta has been diagnosed with depression and anxiety. As of February 2023, Doretta attended outpatient therapy once a week with a treatment goal of reducing the intensity of her anxiety, fears, and worries, which stemmed in part from her relationship with her parents and issues that arose from their visits.

Doretta testified during the trial, and the judge implicitly credited that testimony. Although Doretta loved her parents, she was angry at them and "[felt] fine" not living with them. Visits with them were stressful; the mother forced food on her, and the father talked about the court proceedings. The mother whispered in Doretta's ear, telling her that she was coming home, but then denied having done so when Doretta, who "couldn't stand it," told the department about the whispering.

Doretta also testified that she "was raised to lie." The father told her what to say to the department, including that he and the mother were completely disabled and confined to a bed and a wheelchair, which Doretta testified was not true. Before Doretta was removed, the father controlled Doretta's participation in therapy sessions, which took place by video conference, by giving her scripts to use and telling her what to say. Because of this, Doretta "never . . . got to open up to [her] therapist."

Erik was diagnosed with autism, depression, and anxiety; as of February 2023, he attended outpatient therapy once a week. Erik did well in school, where he benefited from an individualized education plan. He needed "continued support from professionals . . . to develop as an individual person, separate from both [his siblings], and independent of the inappropriate and unrealistic demands of [the parents]."

Daniel was diagnosed with severe autism. He was a residential student at an educational center specializing in providing applied behavioral analysis (ABA) services. When he arrived there, Daniel was essentially nonverbal and deliberately harmed himself by hitting his head and biting himself. By the time of trial, his consistent engagement in ABA services had significantly reduced his dangerous behaviors and increased his verbal and nonverbal communication skills. Daniel still

required vigilant supervision twenty-four hours a day, seven days a week; continued consistent engagement with ABA services was necessary to keep him safe and help him achieve his full potential.

The father and the mother opposed Daniel's placement at the educational center and maintained that its services were unnecessary and inappropriate.  The judge found that if Daniel was in the father's custody, Daniel would not be enrolled at the educational center, and "would not have made such significant progress."  Further, the father and the mother repeatedly -- and falsely -- accused the educational center of abusing Daniel.  Both tried to take photos of his naked body to substantiate alleged injuries.  The center staff described the parents' visits with Daniel as distressing for him and not "therapeutic."  The parents had unrealistic expectations that Daniel participate in hour-long virtual visits.  The father was "unsupportive" and potentially "combative" of the staff's attempts to support Daniel.

b.  The father.  The father reported coming to the United States in his twenties as an Iranian refugee fleeing political and religious persecution.  In his life in the United States, he has been dedicated to advocating for issues including worker protection and veterans' safety, and he reported having been a whistleblower and having engaged in public protest to bring

attention to these issues.  He is highly educated and asserted fluency in four languages.

Although the father loves his children and "considers them to be gifts," the judge found that the father's ability to engage with, accurately report to, and follow up with the children's service providers was "hampered, and at times made impossible by his detrimental patterns of behavior."  The judge found that the father is "argumentative, fixated, and passionate to the point of appearing aggressive and threatening.  He perseverates on certain topics and repeats decades-old examples of how he has been wronged or victimized."  The father denied throughout the proceedings, including trial, and continues to deny on appeal, that he has any mental health issues.  The judge concluded that his behavior in court indicated otherwise and noted that his denial prevented him from receiving potentially helpful treatment.

Throughout the case, the father identified his experience as a whistleblower sixteen years before trial as the reason he and his family have been -- in his view -- consistently targeted, victimized, and retaliated against.  The father "insisted on discussing the 2007 whistleblower story . . . when it was completely irrelevant to the situation at hand," and as a result, he was "unable to effectively communicate with professionals in the community."  For example, the father called

911 when he thought Daniel was being assaulted but could not communicate with the 911 dispatcher about the emergency because he insisted on recounting his whistleblower history. The father would not be deterred from his recounting, even when the dispatcher tried to ask questions relevant to the emergency.

When attempting to address an "issue or challenge he or the [c]hildren face," the father "demands the specific service he believes is appropriate and necessary and will accept nothing else." Communication with service providers became "on-going battle[s] about retaliation against the family for the whistleblower situation, followed by complaints, grievances, and lawsuits." The father's "all or nothing approach often resulted in nothing for the [c]hildren."

The father appropriately initiated some services and interactions, but "collaboration [was] only possible to the extent that the party he engage[d] [was] willing to comply with his rules; his rules [were] inflexible and [could not] be altered, even in the face of contradictory information." For example, once, at the father's request, an agency agreed to pay to have a taller fence installed around the family's home for Daniel's safety, but the father insisted that the department secure a needed variance. Despite being told the variance was his responsibility, the father refused to budge from his position. As a result, the "[f]ather's insistence on strict

adherence to his specific method of problem solving prevented his own solution from being implemented," and the fence was never built. "[A]ttempts to challenge or alter his rules [were] treated by [the] [f]ather as an existential threat." The father similarly "respond[ed] to minor issues or problems as though they [were] significantly larger and more serious, demanding responses which end[ed] up being grossly out of proportion." This trait "severely limit[ed] his ability to be an "advocate and protector of his [c]hildren . . . leav[ing] them at risk of serious abuse and/or neglect."

The father's physical condition was the subject of contradictory evidence. He described himself as "totally disabled," unable to leave the house without an ambulance and two emergency medical technicians, incontinent, in constant need of supplemental oxygen, and using a feeding tube. Doretta testified that when "important people" came to the house, her father would "go to his bed," and that she saw her father both "put on" medical equipment when people come to the house and camouflage himself in blankets before walking outside. During the trial, the father said that he was working out up to sixteen hours a day and looked like Rambo and Hulk Hogan. He asserted that he experienced headaches, neck and back pain, and nerve damage that prevented him from using his hands. Yet the judge saw him writing what appeared to be pages of notes during trial,

and the father would not permit the department to verify the father's reported health issues with his medical providers.

c. The mother. The mother's native spoken language is Fuzhou, a Chinese dialect. She is unable to read or write. She reported that she does not speak, read, or write English other than a few simple words. The mother relied on the father to communicate for her, although the record reveals no fluently spoken language common between the two of them. The mother's inability to communicate in English "resulted in her total dependence on [the] [f]ather, and limited her ability to function as the parent the [c]hildren need." The mother deferred to the father in practically every respect: the father handled appointments for her and the children, and the father controlled her engagement with the department.

The mother has some physical limitations, the cause and extent of which are unclear. She would not allow the department to verify her physical health. The father has described her as totally disabled, yet also able to mow the lawn, shovel snow, and chase the children. Doretta corroborated that her mother "mow[ed] the grass and did outside work, and . . . raked the leaves."

Both parents refused to engage in any services because they did not acknowledge that their parenting could be improved.

d.   Court clinic evaluation.   On October 19, 2021, the judge ordered both parents to "undergo court clinic evaluation as to competency to represent themselves."   The evaluations were filed by the clinic on November 2, 2021.   The clinician, noting there was no legal standard for either "competency to proceed in [care and protection] cases in [Massachusetts]" or "evaluating the capacity for self-representation," decided to "adapt[] the legal criteria for competency to stand trial in criminal cases."

The clinician's effort to evaluate the mother was hampered by many factors:   an expedited schedule, the need to meet by video conference because of COVID-19 concerns, limitations on the interpreter's availability, language and cultural differences, possible coaching by the father, and the absence of requested records from the department.   Despite the limitations, the clinician conducted the evaluation and opined that the mother "did not demonstrate the skills generally associated with competence to stand trial."

The clinical evaluation of the father was more robust; the clinician met three times (by telephone or video conference) with the father, interviewed the father's then-current lawyer, and reviewed documents the father provided.   She concluded that the father had neither a "cognitive defect" nor a "significant mental illness that would interfere with his competency to proceed at this time."   She noted that, although the father had

"some mental health limitations," in her opinion they were not "currently . . . a significant impediment to his competency to proceed with his cases."  The clinician opined that the father "require[d] support to parse what is relevant detail for the purpose of his defense in his case" and "does well with an explanation of why certain data, which he believes is important, does not contribute to his defense."

e.  The father's representation.  Before trial, while represented by his fifth counsel, the father asked to represent himself.[2]  At a status hearing on January 24, 2022, the father informed the judge that he "was going to represent [himself] on this hearing" and there was "a possibility that [he] may continue to request for representing [himself] in a future hearing."  The judge explained that self-representation was not available "on an event-by-event basis" and that the father's lawyer could either represent him or act as standby counsel.  The father said he "definitely need[ed] a standby attorney with [an] expanded scope of work."

On January 28, 2022, the father's counsel filed a motion to withdraw.  Citing a "respectful but irreconcilable disagreement"

---

[2] The father had earlier asked to represent himself during the temporary custody hearing.  The father, the mother, and the children appealed the temporary custody determination, which gave rise to Doretta I.  They did not raise the issue of self-representation in that appeal, see Doretta I, 101 Mass. App. Ct. 584, and we do not consider that issue here.

about the role of standby counsel, counsel sought a "complete withdrawal" and requested that the father be allowed to represent himself.  At a hearing on the January 28 motion, the judge acknowledged the court clinic evaluation of the father's competency to represent himself but noted that she was not required to adopt its conclusions.  The judge also made clear that she had no reason to question the father's fifth counsel's "level of preparedness or readiness to engage in representing" the father.

During a colloquy with the father, the judge explained that, if he represented himself, he would be bound by the same rules, regulations, procedures, and practices as any practicing lawyer.  The father acknowledged that he understood, but stated he was entitled to an accommodation under the Americans with Disabilities Act (ADA).  When the judge asked him what accommodation he was seeking, the father raised "potential judicial bias and judicial conflict of interest," and asked for a change of venue.

The judge asked the father many times whether he was asking to have his lawyer removed from the case.  The father's answers ranged from "I do believe that only a fool will have himself for an attorney" to assertions that he was a victim of past ineffective representation, to seeking to represent himself and his children, to asking for standby counsel.  The judge told the

father that he could not represent his wife or children and again reminded him that, if he were to represent himself, he would be bound by all the same rules and procedures as a lawyer. After the judge took the motion to withdraw under advisement, the father interrupted the hearing to repeat that he would need standby counsel with an "expanded scope of work," including administrative duties, such as typing e-mail messages. The judge explained that this request demonstrated a misunderstanding of the role of standby counsel.

The judge ruled that the father's fifth counsel could withdraw as soon as successor counsel filed an appearance and denied the father's request to represent himself and appoint standby counsel. On a subsequent motion to reconsider, the judge declined to alter her original order.[3] No new counsel filed an appearance, and trial began on February 6, 2023, with the father represented by his fifth counsel.

The father made numerous requests to represent himself during and after trial. These requests centered on the father's

---

[3] At the father's request, the judge filed findings of fact and an explanation relative to her denial of the father's counsel's request to withdraw. Shortly thereafter, the father pursued an interlocutory appeal of the order. The single justice denied the father's petition noting that, after a review of the petition and supporting materials, the father had "not met his burden of establishing that the judge abused her discretion when denying" the father's request to represent himself.

dissatisfaction with counsel's trial strategy; in one, the father explained that he had "200,000 exhibits" and needed "at least a month of trial." After the close of evidence, the father's counsel successfully sought to reopen the evidence and then filed another motion to withdraw. The judge denied the motion, noting that she had previously denied two similar motions, and saw no "substantial difference" that warranted reversal.

f. The mother's representation. By the time of trial, the mother was represented by her third counsel, having been without a lawyer for two status conferences.

The third counsel filed a motion to withdraw on December 9, 2022. Trial was scheduled to begin in February of 2023. At the hearing on the motion, the mother's then-counsel stated that the mother "completely disagree[d] with anything and everything [the counsel] would want to do at this point" and would prefer to represent herself, or, failing that, have substitute counsel. The judge denied this request, noting that the court clinic evaluation "suggested that self-representation was not appropriate," and citing the multiple changes of counsel that had resulted in significant delays and gaps in representation, as well as the approaching trial date.

On August 25, 2023, the last day of trial, the third lawyer filed a second motion to withdraw, asking the judge either to

allow the mother to proceed pro se, or to appoint new counsel. This motion was denied. The judge relied on the court clinic evaluation to find that the mother was not competent to waive her right to counsel.

2. Discussion. a. The father's right of self-representation at trial. We review the judge's denial of the father's requests to represent himself de novo, affording "'substantial deference' to the trial judge's factual findings related to the loss of the right to counsel." Adoption of Raissa, 93 Mass. App. Ct. 447, 452 (2018), quoting Commonwealth v. Means, 454 Mass. 81, 88 (2009).

The father contends that he has a constitutional right to self-representation in this care and protection case.[4] He bases his claim on criminal law, including art. 12 of the Massachusetts Declaration of Rights, and Means, 454 Mass. at 88-89. Because it helps to frame the issue, we begin with a short summary of the right to self-representation.

The constitutional right to counsel in criminal cases is well established under both Federal and Massachusetts law. See United States v. Cronic, 466 U.S. 648, 653-654 (1984); Gideon v.

_____

[4] Erik also purports to challenge the judge's orders relative to the father's and the mother's representation, but he has no standing to raise these claims. See Adoption of Mary, 414 Mass. 705, 713 (1993).

Wainwright, 372 U.S. 335, 343-345 (1963); Commonwealth v. Dufresne, 489 Mass. 195, 203 (2022).

Under both Massachusetts and Federal law, a criminal defendant also has a constitutional right of self-representation. See Means, 454 Mass. at 89, citing Faretta v. California, 422 U.S. 806, 821 (1975); Commonwealth v. Martin, 425 Mass. 718, 720-721 (1997). Both the right to counsel and the right to represent oneself in criminal proceedings are established by art. 12 ("every subject shall have a right to . . . be fully heard in his defence by himself, or his council, at his election"). The right of self-representation in the criminal context "is not wholly unqualified," Commonwealth v. Mott, 2 Mass. App. Ct. 47, 51 (1974), a thread we pick up later.

Parents facing the permanent loss of their children in care and protection cases have both a constitutional right to counsel, which is grounded in the Fourteenth Amendment to the United States Constitution and in art. 10 of the Massachusetts Declaration of Rights, and a statutory right to counsel. See G. L. c. 119, § 29; Department of Pub. Welfare v. J.K.B., 379 Mass. 1, 3-4 (1979). As the Supreme Judicial Court explained, "[t]he interest of parents in their relationship with their children has been deemed fundamental, and is constitutionally protected." J.K.B., supra at 3. "An indigent parent facing the possible loss of a child cannot be said to have a meaningful

right to be heard in a contested proceeding without the assistance of counsel." Id. at 4. The court further explained that

> "[t]he petition may well involve complex questions of fact and law, and require the marshalling and rebutting of sophisticated expert testimony. These aspects of adjudication underscore the necessity of affording appointed counsel to those defendant parents who contest the proceedings. Provision of appointed counsel not only safeguards the rights of the parents, but it assists the court in reaching its decision with the utmost care and an extra measure of evidentiary protection, required by law" (quotations and citation omitted).

Id.

Traditionally, Massachusetts "courts have looked to the criminal law in deciding issues of individual rights in care and protection cases." Adoption of Raissa, 93 Mass. App. Ct. at 452. See Care & Protection of Stephen, 401 Mass. 144, 149 (1987). Even so, courts have "repeatedly rejected incorporating the full panoply of constitutional rights afforded criminal defendants into proceedings involving custody and termination of parental rights." Adoption of Don, 435 Mass. 158, 169 (2001). This limit is grounded in the purpose of a care and protection case, where "the State does not act to punish misbehaving parents[,] but to protect children" (citation omitted). Id. at 168. The privilege against self-incrimination, Care & Protection of Quinn, 54 Mass. App. Ct 117, 121 (2002), the right to face-to-face confrontation, Adoption of Don, supra, and

principles of double jeopardy, Custody of a Minor, 375 Mass. 733, 746 (1978), are examples of constitutional rights deemed essential in the criminal context, but not applicable in care and protection proceedings.

Relying on Means and Faretta, the father asserts that he has a constitutional right of self-representation. After careful review, we consider the passing reference in Means, 454 Mass. at 89, relating to self-representation in civil cases to be dictum and thus without precedential value. See Commonwealth v. Rahim, 441 Mass. 273, 284-285 (2004). Means was a criminal case, and the comment about civil cases was not dispositive to the outcome. See Means, supra, citing Faretta, 422 U.S. at 821 ("Just as criminal defendants have a constitutional right to be represented by counsel, individuals in criminal and civil matters have a constitutional right to represent themselves"). See also Martinez v. District Court of Appeal of Cal., 528 U.S. 152, 154 (2000) (Faretta "extend[s] only to a defendant's constitutional right to conduct his own defense" [quotation omitted]).

Unlike art. 12, which grants criminal defendants both the right to counsel and the right of self-representation, there is no provision in the Massachusetts Declaration of Rights that

speaks to the right of self-representation in civil cases.[5] The father has not briefed whether such a right can be inferred from art. 10 of the Declaration of Rights, the Fourteenth Amendment to the United States Constitution, or some other constitutional provision, and he has cited no case (nor have we found one) addressing a constitutional right of self-representation in the context of a care and protection case. Moreover, although a parent in a care and protection case has the same statutory right of self-representation applicable to all Massachusetts civil cases, G. L. c. 221, § 48,[6] the father has not shown, or even argued, that he was unlawfully deprived of his statutory right or that he suffered resulting prejudice, as was his burden. See Commonwealth v. A Juvenile (No. 2), 396 Mass. 215, 224 (1985) ("Ordinarily, . . . the deprivation of a statutory right is not grounds for reversal unless the [party] can demonstrate resulting prejudice").

---

[5] Nor is there any such provision in the United States Constitution. Indeed, numerous courts have held in the civil commitment context that there is no Federal constitutional right to self-representation in civil cases. See, e.g., United States v. O'Laughlin, 934 F.3d 840, 841 (8th Cir. 2019), cert. denied, 589 U.S. 1283 (2020); Matter of V.H., 996 N.W.2d 530, 537 (Iowa 2023); Matter of S.M., 389 Mont. 28, 32, 38 (2017).

[6] Parties in civil cases are statutorily permitted to "prosecute or defend their own suits personally, or by such attorneys as they may engage." G. L. c. 221, § 48.

In the case before us, however, we need not decide whether parents have a constitutional right of self-representation in care and protection cases because, if such a right exists, the father did not properly exercise that right. Even in the criminal context, where defendants do have a constitutional right to self-representation, Faretta, 422 U.S. at 836; Means, 454 Mass. at 89, the right is not absolute. Mott, 2 Mass. App. Ct. at 51. First, a defendant's request to exercise this right "must be unequivocal." Id. "Second, the request should be asserted before trial." Id. "Third, and perhaps most important, the trial judge should be satisfied that the right is being exercised knowingly and intelligently, and not for an ulterior purpose." Id.

Before applying this test borrowed from the criminal law, we pause to recognize that care and protection cases are materially different from criminal cases because "the focus of proceeding[s] [that terminate or curtail parental rights] should be on the best interests of the child." J.K.B., 379 Mass. at 5. See Adoption of Don, 435 Mass. at 169 (listing criminal constitutional rights not afforded parents in proceedings involving custody and termination of parental rights). Where children's interests are at stake, "the balance to be struck" between "the rights of the individual parent and the interest of society" and the "rights and needs of the child" is "complex."

Adoption of Olivia, 53 Mass. App. Ct. 670, 677 (2002), quoting J.K.B., supra. "[R]ecognition of important parental rights does not change the 'crucial fact' that the focus of proceedings that terminate or curtail parental rights should be the best interest[s] of the child." Id. "The children's rights to a stable and safe environment, therefore, assume an importance at least equal to the parent's interest." Adoption of Olivia, supra.

In criminal cases, by contrast, "where the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires." Mott, 2 Mass. App. Ct. at 52, quoting United States ex rel. Maldonado v. Denno, 348 F.2d 12, 15 (2d Cir. 1965), cert. denied sub nom. DiBlasi v. McMann, 384 U.S. 1007 (1966).

With this distinction in mind, we turn to the three-part inquiry from Mott, beginning with timeliness. A "defendant's right to proceed pro se can be circumscribed if it is raised during or on the eve on trial." Commonwealth v. Najjar, 96 Mass. App. Ct. 569, 578 (2019). "It is in these situations that the judge must weigh 'the interests of the courts and the public in efficient trial administration' with 'a showing of good cause to support the defendant's motion.'" Id., quoting Commonwealth v. Chavis, 415 Mass. 703, 712 (1993). This good cause

requirement "is designed to protect efficient trial administration, not to protect a defendant from making a poor decision." Id. at 578-579. The timely adjudication of child custody cases is no less urgent than the timely adjudication of criminal cases. See Adoption of Valentina, 97 Mass. App. Ct. 130, 134 (2020). A careful review of the record reveals one pretrial request by the father: the January 28, 2022 motion to withdraw and the associated May 9, 2022 motion to reconsider. The father's remaining requests were made after trial began, so it was within the judge's discretion to deny them, and we need not consider them here. Najjar, supra.

We are not convinced that the father's pretrial request was unequivocal. Although the written motion unambiguously sought the court's leave for counsel to withdraw, the father vacillated when questioned by the judge. The father's "vacillat[ion] in his requests between several different arrangements regarding his representation" demonstrates the request was not unequivocal. Commonwealth v. Chapman, 8 Mass. App. Ct. 260, 266 n.4 (1979).

The father's behavior stands in stark contrast to that of the criminal defendant in Mott, who told the judge that he would prefer to defend himself, was "ready for trial," and had to "think of [his] case the way [he] figure[d] [was] better for [him]." Mott, 2 Mass. App. Ct. at 49 n.2. See Najjar, 96 Mass.

App. Ct. at 581 (defendant engaged in "extensive pretrial dialogue" with judge and gave "unequivocal responses" to questions about proceeding pro se).  In the circumstances, we cannot conclude that the father's pretrial request to represent himself was unequivocal.

Even if the father's request was unequivocal, we conclude that his request would still fail because it was not being exercised "knowingly and intelligently, and not for an ulterior purpose."  Mott, 2 Mass. App. Ct. at 51.  To analyze this factor, in a criminal case, "the trial judge should conduct some sort of inquiry once the defendant has made a timely and unequivocal request in order to ascertain the defendant's motives for asserting the right."  Chapman, 8 Mass. App. Ct. at 265, citing Mott, supra at 52.

Although the judge did not conduct a colloquy explicitly directed at answering this question, it is evident both from her extended discussion with the father at the March 8, 2021 hearing and from her written findings denying the father's January 28 motion that she concluded that the father's request did not pass this test.  For example, the judge found that the father's actions repeatedly delayed the proceedings, noting that the "[f]ather has consistently interrupted and spoken out asserting his thoughts and opinions during court events, sometimes related to the matter being discussed, and often relating to other

issues entirely."  After reviewing the clinic evaluation and seeing the father in court, the judge found she had "no confidence in [the] [f]ather's ability to maintain proper courtroom decorum, follow procedural rules, or abide by [c]ourt orders and directions."  These findings support the denial of the father's request to represent himself.  Contrast Commonwealth v. Conefrey, 410 Mass. 1, 11-12 (1991) (no ulterior purpose could be presumed where nothing in record suggested defendant "would [not] cooperate in good faith with rulings and directions of the judge throughout the trial . . . ."); Chapman, 8 Mass. App. Ct. at 267 (where nothing in record showed defendant was trying to delay proceedings, it cannot be said he "waived his right by asserting it to further an ulterior, dilatory purpose").  The judge's assessment of the situation finds support in the father's requests to try his case with 20,000 to 200,000 exhibits and up to 200 witnesses.

And, crucially, this was not a criminal case.  We end this analysis where we began, with the unique characteristics of care and protection cases.  See, e.g., Adoption of Don, 435 Mass. at 169; Adoption of Valentina, 97 Mass. App. Ct. at 134 ("judge must balance the interests of the parent with the child[ren]'s interest in finality").  The children, with special needs ranging from mild to severe, had been removed from their parents' care for eight months when the judge issued her

findings on the January 28 motion. Even if the father's interest in representing himself was constitutionally protected, in the circumstances of this case the judge did not err in denying the father that opportunity. See Adoption of Ilona, 459 Mass. 53, 61 (2011) ("the parents' rights are secondary to the child's best interests and . . . the proper focus of termination proceedings is the welfare of the child" [citation omitted]).

b. The father's right of self-representation on appeal. The father also asserted, in an emergency preargument filing, that he had a right to self-representation on appeal. Even in the criminal context, there is no such right under the United States Constitution, see Martinez, 528 U.S. at 163, and we have found no case recognizing one under the Massachusetts Declaration of Rights. Rather, appellate courts may exercise their discretion in deciding whether to allow nonlawyers to represent themselves on appeal. See id. Given the eleventh-hour timing of the father's request, the challenge of balancing the priorities of care and protection cases and self-representation by a parent, and the "significant differences between the trial and appellate stages" of a case (citation omitted), id. at 162, we exercised our discretion to deny the father's request.

c. Counsel for the mother. The mother contends that her due process rights were violated because she did not have

appointed counsel during "critical hearings," and was subsequently "forced to retain counsel not of her choice." The mother makes no argument as to what transpired at these hearings or how they were "critical." We have reviewed the transcripts of the two status hearings held while the mother was without an attorney and see no rulings that give us pause. The judge steered clear of any substantive discussion related solely to the mother, noting that efforts were underway to provide her with new lawyers, and that matters including the mother's ADA meeting would be scheduled after she had counsel.

The mother's brief strongly conveys her dissatisfaction with counsel but fails conclusively to tie that dissatisfaction to a particular legal framework. Although she adverts to Faretta, she failed to assert that any ruling by the judge denying a self-representation request was error. Application of the Mott framework is therefore not called for. The mother disclaims any ineffective assistance of counsel, so we do not apply the Saferian standard, see Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). See also Adoption of Raissa, 93 Mass. App. Ct. at 455. The nub of her objection seems to be that she did not have "a representative who would handle the case in the manner that [the] mother requested," and did not "want the counsel that will not accede to her demands." But we are aware of no principle, and the mother cites none, that dictates a

client is entitled to counsel who will "follow her theory of the case." See Commonwealth v. Moran, 17 Mass. App. Ct. 200, 204 (1983). "The right to counsel does not include the right to dictate who shall be appointed"; in the absence of demonstrated "good cause" to substitute counsel, a "perceived lack of a meaningful relationship" is not "grounds for discharging [a] lawyer." Adoption of Olivia, 53 Mass. App. at 675. There was no error.

d. Sufficiency of the evidence. A judge's decision to terminate parental rights must be supported by "clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Arianne, 104 Mass. App. Ct. 716, 720 (2024), quoting Adoption of Xarissa, 99 Mass. App. Ct. 610, 615 (2021). "We review the judge's findings with substantial deference, recognizing her discretion to evaluate a witness's credibility and to weigh the evidence." Adoption of Nancy, 443 Mass. 512, 515 (2005). We "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. Having considered the parties' arguments and reviewed the extensive record, we see no reason to disturb the judge's findings of unfitness or the best interests determinations.

"Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. at 711. See Adoption of Quentin, 424 Mass. 882, 887 (1997) ("judge may consider whether parental behavior adversely affects the child"). In making the best interests determination, the judge was entitled to weigh the evidence as she saw fit, and "[w]e do not sit as a trial court to review de novo the evidence presented by the parties." Adoption of Paula, 420 Mass. 716, 730 (1995).

Here, the judge's findings identified each of the children's individual needs, including the need for "a safe and secure home, with parents who can put the [c]hildren's needs first, and assure that their educational, developmental, emotional, mental, and physical health needs are consistently met." The father, the mother, and Erik do not contest any of the specific findings relative to the needs of the children. Nor do they contest the findings that the father's "detrimental patterns of behavior" hamper his "ability to initiate, engage, accurately report, and follow up with" service providers; that his "[rigid] and insistent methods often result in no services or assistance at all"; and that "it is emotionally abusive and neglectful to require that the [c]hildren join in perpetuating

his untruths."  Instead, the majority of the father's, the mother's, and Erik's claims about the evidence of unfitness "amount to no more than dissatisfaction with the judge's weighing of the evidence and [her] credibility determinations." Adoption of Quentin, 424 Mass. at 886 n.3.

The father also contends that the lack of expert evidence establishing a nexus between his mental health and any instances of neglect precluded the judge from finding that "[t]he barriers to [the] [f]ather's safe parenting of the [c]hildren are rooted in his untreated mental health issues."  We are not persuaded. The father's behavior was one of several factors the judge properly considered in determining the father's unfitness.  See Care & Protection of Vick, 89 Mass. App. Ct. 704, 709 (2016) (parent's "over-all demeanor . . . was one of several factors that contributed to [their] parental shortcomings"); Adoption of Eduardo, 57 Mass. App. Ct. 278, 282-283 (2003) (judge did not err in considering parent's mental illness to extent it explained inability to provide for child).  Although the father unquestionably loves the children, the judge thoroughly detailed the link between the father's detrimental patterns of behavior and his unfitness.  We see no reason to disturb the judge's findings.

The record evidence is also sufficient to demonstrate the mother's unfitness.  Although she too unquestionably loves the

children, her visits with both Doretta and Daniel were extremely upsetting to the children; she did not engage in her action plan tasks, and her relationship to the world -- including the department and the children's service providers -- was solely through the father, resulting in a lack of cooperation.  The judge found that the mother "is a willing participant in the family dynamic that allows [the] [f]ather to be in total control, and she persists in this position despite the negative consequences, all to the [c]hildren's detriment."

The record amply supports the judge's findings that the children suffered damage to their psychological, emotional, and moral development while in the parents' custody.  Furthermore, "the judge was entitled to focus on the consistent inability or unwillingness of the parents to cooperate with service plans and the comparative improvement" of the children in their preadoptive placements.  Custody of Michel, 28 Mass. App. Ct. 260, 270 (1990).  See Adoption of Carla, 416 Mass. 510, 519-520 (1993).  "[T]he judge [was] not required to grant the [parents] an indefinite opportunity to reform," and, in considering the evidence that their unfitness was not temporary, and that they had not complied with their service plans, "the judge . . . properly determine[d] that the child[ren]'s welfare would be best served by ending all legal relations between [the]

parent[s] and [the] child[ren]."  Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012).

e.  The father's access to case records.  The father also asserts that his due process rights were violated because he was denied access to his case records and thus precluded from participating meaningfully at trial and assisting his counsel. Given the timing and nature of his requests, we are unpersuaded.

The father's sole pretrial request for these materials was a contingent one made in the context of his counsel's January 28, 2022 motion to withdraw; counsel asked that, if he were allowed to withdraw, he be permitted "to deliver . . . all materials received by [him] from the [department], and/or prior counsel" to the father.  This request became moot when the judge denied the motion for the father to represent himself.

The father also rests this claim on the midtrial denial of a motion for fees and costs to obtain a transcript of the previous days of trial, asserting that his disabilities prevented him from taking notes, and that future trial dates needed to be postponed for the father "to review the transcript and prepare for his rebuttal testimony."  The father does not challenge the judge's findings, in denying the request, that in fact he could write and take notes.  We conclude that the denial

of this motion did not hinder the father's ability to rebut the allegations against him.[7]

    f. <u>Conclusion</u>. The decrees are affirmed. The order denying the amended and renewed motion to reopen evidence is affirmed.

<u>So ordered</u>.

---

[7] The father also relies on a December 2023 pro se motion seeking access to the court case records. Because this motion postdated trial, its denial could not have meaningfully affected the father's ability to participate in the trial or assist his counsel.